**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 92-5767

MELVIN A. FORD,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 92-5768

CYNTHIA EVETTE BROWN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 92-5781

CARLOS EDWIN MCGILL,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 92-5802

MICHAEL DEWAYNE SHORT,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 92-5809

ERIC S. BROWN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 93-5071

NORMAN O'NEAL BROWN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 93-5080

WALTER TREVAUGHN SMITH,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 93-5097

JEFFREY ANDREW REID, a/k/a U.S.,
Defendant-Appellant.

2

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 93-5152

RODERICK BROWN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 93-5180

HASSAN LAFIEK SMITH,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 93-5313
ROBERT ANTONIO WILLIAMS, a/k/a
John Doe, a/k/a Gibby,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 93-5362
MICHAEL STEVEN SMITH, a/k/a Black
Mike, a/k/a Smitty,
Defendant-Appellant.

3

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-90-454-WN)

Argued: December 8, 1995

Decided: July 15, 1996

Before RUSSELL and HALL, Circuit Judges, and THORNBURG,
United States District Judge for the Western District
of North Carolina, sitting by designation.

_____

Affirmed in part and vacated and remanded in part by published opin-
ion. Judge Russell wrote the opinion, in which Judge Hall and Judge
Thornburg joined.

_____

**COUNSEL**

**ARGUED:** John David Ash, Baltimore, Maryland; James Christo-
pher Savage, LAW OFFICES OF JAMES SAVAGE, Rockville,
Maryland; Arcangelo Michael Timinelli, Baltimore, Maryland; Wil-
liam B. Purpura, Baltimore, Maryland; David Richard Solomon, Bal-
timore, Maryland; William Scott Little, STARK & LITTLE,
Baltimore, Maryland; Colin R. Hueston, EUGENE P. TINARI &
ASSOCIATES, Philadelphia, Pennsylvania; Daniel Tisdale, Balti-
more, Maryland; Alan Curtis Drew, Upper Marlboro, Maryland, for
Appellants. John Vincent Geise, Assistant United States Attorney,
Greenbelt, Maryland, for Appellee. **ON BRIEF:** Eugene Patrick
Tinari, Philadelphia, Pennsylvania, for Appellant Eric Brown;
C. Michael Walls, Laurel, Maryland, for Appellant Hassan Smith;
Gary L. Segal, Rockville, Maryland, for Appellant Michael Smith;
Howard L. Cardin, CARDIN & GITOMER, P.A., Baltimore, Mary-
land, for Appellant Cynthia Brown; Kenneth Mack Williams, Balti-
more, Maryland, for Appellant Walter Smith; Jeffrey C. Hines,
Baltimore, Maryland, for Appellant Roderick Brown. Lynne A. Bat-

4

taglia, United States Attorney, Barbara S. Skalla, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

_____

**OPINION**

RUSSELL, Circuit Judge:

This case is the result of an extensive investigation into the cocaine trafficking activities of Paul Winestock, Jr., Norman Brown, and numerous associates. The investigation included court-ordered electronic surveillance on several cellular telephone lines, numerous undercover drug buys made by police agents, and the searches of approximately 32 locations in Maryland, Virginia, the District of Columbia, and Pennsylvania. The investigation led to the indictment of thirty defendants, fifteen of whom were convicted after four separate trials and six of whom entered guilty pleas.

The main trial of seventeen defendants (referred to by the parties as the "Winestock" trial) began on November 4, 1991. The trial continued for sixty-nine trial days and concluded on March 31, 1992. The jury acquitted all of the defendants on the conspiracy counts.[1] The jury, however, convicted each of the following defendants on at least one substantive count: Paul Winestock, Jr., Norman Brown, Melvin A. Ford, Eric S. Brown, Jeffrey A. Reid, Walter T. Smith, Roderick Brown, Michael D. Short, Carlos E. McGill, Robert A. Williams, and Cynthia E. Brown. Except for Paul Winestock, Jr.,[2] all of these defendants are parties to this appeal.[3]

_____

[1] Count I of the indictment charges a conspiracy of all of the defendants. In Counts II and III, the indictment divided the defendants into two groups and charged a conspiracy of each group. Count II involved the group headed by Norman Brown; Count III involved the group headed by Paul Winestock, Jr.

[2] Although Winestock's appeal was originally consolidated with this case, we ordered that his appeal be deconsolidated on June 14, 1996.

[3] The jury acquitted the other six defendants: Douglas Allston, Paul Winestock, Sr., Delbert Mobley, Terrance Ross, Alvin Martin, and Eric Allston.

The trial against the other two defendants (the "Smith" trial) began on April 7, 1992. At the completion of the trial, the jury convicted Hassan L. Smith and Michael S. Smith on all counts brought against them.[4]

The thirteen appellants have raised numerous arguments to their convictions and sentences. We find error only in the sentencing of Jeffrey A. Reid, which we vacate and remand for resentencing. We affirm the convictions and sentences of all of the other appellants.

I.

We first turn to the sentencing of Jeffrey A. Reid, the one issue on which we reverse. Reid was convicted on two counts of possession with intent to distribute crack cocaine. The district court attributed to him eight kilograms of crack cocaine and sentenced him at level 40.

Reid's presentence report assigned three criminal history points to Reid, thus placing him in criminal history category II. He received one point for a 1987 drug conviction in the District of Columbia and two points for a 1987 conviction in the same jurisdiction for unauthorized use of a vehicle. At sentencing, the government presented evidence that Reid had violated the terms of his probation on the drug conviction, for which he received a sentence of 90 days imprisonment. Pursuant to § 4A1.1 of the Sentencing Guidelines, the government added another criminal history point for the violation of probation, which elevated Reid's criminal history category to Category III. Because the government surprised Reid with this information, the district court agreed to sentence Reid at the low end of the Category III range (360 months), with the understanding that the court would reopen the matter if Reid found that the extra criminal history point was wrongly added. The court clearly stated that it would sentence Reid at the low end of the Category II range (324

_____

[4] The jury could not reach a verdict on the charges brought against a third defendant, Vincent Knight. Knight later entered a guilty plea on one of the counts. The court also conducted two other jury trials against Derrick Curry and Tyrone Lancaster. The jury convicted each on at least one count. Curry has filed an appeal, but it was deconsolidated by order of the court on March 1, 1995. Lancaster has not filed an appeal.

months) if Reid established that Category II was the appropriate category. After conducting further research, Reid's attorney conceded that the government correctly assigned four criminal history points to Reid.

After sentencing, Reid's attorney learned that the 1987 drug conviction used in the criminal history category determination resulted from Reid's participation as a member of the Winestock group for the distribution of cocaine in Washington. On this appeal, Reid argues for the first time that he should not have received criminal history points for the prior drug conviction because it was part of the same course of conduct as his current convictions. Reid argues that we should subtract the two criminal history points assigned from that conviction and sentence him to the low end of the Category II range. The government concedes that Reid should not have received criminal history points for the 1987 conviction but argues that Reid failed to raise the issue before the district court at sentencing.

A defendant's failure to object to a sentencing issue amounts to a waiver of his right to raise that issue on appeal, absent plain error. United States v. Grubb, 11 F.3d 426, 440 (4th Cir. 1993). Under this standard, we must find that (1) an error was committed, (2) the error was plain, and (3) the error affected the defendant's substantial rights. United States v. Olano, 113 S. Ct. 1770, 1777-78 (1993); United States v. Lockhart, 58 F.3d 86, 88 (4th Cir. 1995). Once these threshold requirements are satisfied, we must also decide whether the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Olano, 113 S. Ct. at 1779 (quoting United States v. Young, 470 U.S. 1, 15 (1985)); Lockhart, 58 F.3d at 88.

There is no question that an error was committed: even the government concedes that Reid erroneously received two criminal history points for a prior conviction that was part of the same course of conduct as his current convictions. The error was plain because, under the Sentencing Guidelines, a defendant should receive criminal history points for a "prior sentence" only if the prior conviction arises from "conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). The error clearly affected Reid's substantial rights because the extra points caused Reid to be sentenced at a more severe guideline range. See United States v. Robinson, 20 F.3d 270, 273 (7th Cir. 1994) ("A sen-

7

tence based on an incorrect guideline range constitutes an error affecting substantial rights and can thus constitute plain error.").

Furthermore, sentencing a defendant at the wrong guideline range seriously affects the fairness, integrity, and public reputation of the judicial proceedings. If we do not correct this error, Reid will serve a term of imprisonment three years longer than required by the sentencing guidelines.[5] We cannot casually ignore this fact because of an overly-strict adherence to technical requirements. Three years of a man's life is not a trifling thing. No court of justice would require a man to serve three undeserved years in prison when it knows that the sentence is improper. The fairness, integrity, and public reputation of our judicial system demand that we correct Reid's sentence.

The district court stated at sentencing that it would sentence Reid at the low end of the Category II guideline range (for a level 40 offense) if that criminal history category were appropriate. We therefore vacate and remand Reid's sentence with instructions to resentence him to 324 months imprisonment, the low end of the Category II guideline range.

## II.

Having addressed the one issue on which we reverse, we now turn to the numerous issues on which we affirm. We first address the pretrial issues arising from the Winestock trial.

### A. Wiretaps

The appellants challenge the government's authority to place wiretaps on the cellular phones of four of the appellants.

_____

[5] The district court stated at sentencing that it would sentence Reid at the low end of the appropriate guideline range, whether it is Category II or Category III. For a level 40 offense, the low end of the Category II range is 324 months, and the low end of the Category III range is 360 months. Thus, correcting Reid's criminal history category would reduce his sentence by three years.

8

Special Agent Eric V. Bryant of the Federal Bureau of Investigation, acting in an undercover capacity, met Norman Brown on November 17, 1989, and portrayed himself as a supplier of untraceable and untappable cellular phones. Bryant gave Brown a cellular phone in exchange for crack cocaine. Subsequently, Bryant supplied Tommy Patrick Johnson and Michael S. Smith with cellular phones in exchange for crack cocaine. Sergeant Thurman J. Dade of the Washington Metropolitan Police Department supplied cellular phones to Paul Winestock, Jr., and his associates.

On September 10, 1990, after receiving court authorization, the government tapped the cellular phones of Norman Brown, Tommy Johnson, Michael Smith, and Paul Winestock, Jr., as well as Winestock's home telephone line. After one month, the government dropped the taps on Johnson's and Smith's phones. The taps on Brown's and Winestock's phones remained until December 5, 1990. The government intercepted hundreds of conversations, many dealing explicitly with drugs. At trial, the government introduced many of these conversations into evidence.

Robert S. Mueller, III, an acting Assistant Attorney General of the Criminal Division of the Department of Justice, authorized the government's applications for wiretaps. The appellants argue that Mueller, as an _acting_ Assistant Attorney General, lacked the statutory power to authorize the wiretap applications. The appellants base their argument on 18 U.S.C. § 2516(1) as originally enacted in 1968:

> The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications by [federal investigative agencies seeking evidence of certain designated offenses].

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 802, 82 Stat. 197, 216 (1968). Under this provision, the Attorney General cannot delegate the power to authorize wiretap applications to _acting_ Assistant United States Attorney Generals.

Congress, however, amended this provision in 1986 to allow an acting Assistant Attorney General specially designated by the Attor-

ney General to authorize wiretap applications. Electronic Communications Privacy Act of 1986, Pub. L. 99-508, § 104, 100 Stat. 1848, 1855 (1986). On May 24, 1989, Attorney General Richard Thornburg gave the power to authorize wiretap applications to "the Assistant Attorney General in charge of the Criminal Division, any acting Assistant Attorney General in charge of the Criminal Division, and any Deputy Assistant Attorney General of the Criminal Division." Order No. 1348-89 of the Attorney General of the United States (May 24, 1989). Thus, Robert Mueller, in his capacity as acting Assistant Attorney General of the Criminal Division, had the power to authorize wiretap applications in September 1990. The appellants argument is therefore meritless.

B. Search of Vehicle

We next review whether the search of Cynthia Brown's vehicle violated the Fourth Amendment.

On October 21, 1990, Paul Winestock, Jr., who based his operation in Maryland, contacted Melvin Ford in Philadelphia, Pennsylvania, and began making arrangements for Ford to supply Winestock with cocaine. FBI agents, having tapped Winestock's cellular phone line and home telephone line, closely monitored all contacts between Winestock and Ford over the next few weeks.

In the early morning of November 9, 1990, the FBI intercepted a telephone call from a man named Eric (later identified to be Eric Brown) to Winestock. Eric notified Winestock that "the main man" had "something" for him that would be available the next day.[6] Other intercepted calls that day clarified that Winestock would receive five kilograms of cocaine from Philadelphia. At 10:19 p.m., the FBI intercepted a conversation between Eric and Winestock, in which they confirmed that the price would be $28,500 per kilogram and that the courier would receive $250 per kilogram, or $1,250. At approximately 9:37 a.m. the following morning, the FBI intercepted another of Eric's calls confirming that his driver was at the International House of Pancakes in a rented red Corsica. At 10:50 a.m., Winestock

_____

[6] Apparently, Eric Brown and Melvin Ford were both agents of the same source in Philadelphia.

10

and the courier spoke to Eric on Winestock's cellular phone. The courier verified to Eric that she had received "the paper, the 1,250," a reference to her courier fee. She also told Eric that she would be on the road within three hours. Winestock told Eric that the couriers were at the Marriott Hotel under his name. Winestock gave Eric the phone number of the hotel.

Undercover agents went to the hotel and observed a rented red Corsica with Pennsylvania license plates. Agents at the hotel had received a general description of the individuals staying in the room under Winestock's name, and they observed two women who fit that general description enter the red Corsica and drive off. They headed south on I-95, instead of north toward Philadelphia. The Corsica travelled recklessly between 80 and 95 miles per hour.

Special Agent Andrew McColl, who headed the investigation of Winestock, was not at the scene but followed these events by police radio and by cellular phone. He concluded that the women in the red Corsica were couriers en route to making another cocaine delivery. He ordered the agents at the scene to stop and search the vehicle. With the assistance of a Virginia state trooper, the agents stopped the Corsica.

Special Agent Stephen Benjamin approached the vehicle and spoke with the driver, Cynthia Brown. He asked for permission to search the contents of the vehicle. She consented. Benjamin asked if he could look in the trunk. Again she consented and handed him the keys. He asked if she would open the trunk; she did. Two bags were in the trunk. Brown identified her bag, and she opened it herself. Benjamin found clothing in the bag, but there was a shoebox at the bottom. When asked, Brown stated that the shoebox contained shoes. Without asking for Brown's consent, Benjamin opened the shoebox and found three kilograms of cocaine.

In a pre-trial motion, the defense tried to suppress the evidence found in the search. The district court denied the motion, finding that the government had probable cause to search the vehicle and had received the defendant's consent to search.

"The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is

11

contained." <u>California v. Acevedo</u>, 500 U.S. 565, 580 (1991); <u>United States v. Gastiaburo</u>, 16 F.3d 582, 586 (4th Cir.), <u>cert. denied</u>, 115 S. Ct. 102 (1994). Probable cause exists where, given all the facts at the time of the search, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Special Agent Benjamin had probable cause to search Brown's car, including the trunk and the containers found within the trunk. From the intercepted conversations obtained with the wiretaps, the FBI agents knew that the women in the red Corsica had delivered five kilograms of cocaine to Winestock. That fact alone likely establishes probable cause to believe that the car might contain either more cocaine or the payment for the cocaine. At the very least, the agents had probable cause to believe the vehicle contained the $1,250 courier fee. Furthermore, the fact that Brown did not return directly to Philadelphia, but instead headed south on I-95 away from Philadelphia, suggests that she was going to make another delivery.

The federal agents had probable cause to believe Cynthia Brown's car contained cocaine or drug money. Thus, Agent Benjamin had the authority to search the car and any container within the car that could hold drugs or drug money, including the trunk, the bag within the trunk, and the shoebox within the bag. Because Agent Benjamin had probable cause for the search, it is irrelevant that Brown did not consent specifically to the search of the shoebox. We conclude that the district court correctly denied the defense's motion to suppress the evidence found in Brown's vehicle.

III.

We next address several trial issues arising from the Winestock trial.

A. <u>Timing of Closing Argument</u>

First, we consider whether Melvin Ford can challenge his conviction on the ground that his attorney delivered his closing argument eleven days before the jury began its deliberations.

12

As already described in the previous section, Melvin Ford was contacted by Paul Winestock, Jr. on October 21, 1990, about the purchase of cocaine. Over the next few weeks, Ford and Winestock made the necessary arrangements, which FBI agents intercepted from their wiretaps. Other surveillance agents saw Ford and Winestock meet in person, both in Maryland and Philadelphia. On November 9 and 10, 1990, FBI agents intercepted a series of telephone calls between Winestock and Eric Brown which revealed the delivery of five kilograms of cocaine from the source in Philadelphia to Winestock in Maryland. These conversations led to the stop and search of Cynthia Brown's vehicle. The jury convicted Ford of one count of distribution of cocaine for his involvement as a middleman for the source in Philadelphia that supplied cocaine to Winestock. As with the other defendants, he was acquitted of conspiracy.

Ford argues that the district court's denial of severance deprived him of an effective closing argument.[7] At the close of evidence, each defendant's attorney made a closing argument. Because of the time involved for so many closing arguments, the jury did not receive the case until eleven days after Ford's attorney made his closing argument. Ford contends that the evidence against him was so weak that if the jury had heard his closing argument closer to its deliberations, he would certainly have been acquitted.

No constitutional or statutory provision gives a criminal defendant the right to have the jury hear his closing argument immediately before the case is sent to the jury. In a large-scale, multi-defendant prosecution, simple logistics demands that some defendants' attorneys will have to make their closing arguments several days or even a few weeks before the jury commences its deliberations. Courts have shown a strong preference for joinder of criminal defendants, which promotes efficiency and judicial economy. United States v. Tedder,

_____

[7] Actually, Ford attempts to twist his argument into a claim for ineffective assistance of counsel. Ford, however, cannot blame his trial counsel for delivering his closing argument eleven days before the jury began its deliberation. The attorney had no choice in the matter. The district court, by denying the defendants' motion for severance, forced the simultaneous trial of seventeen defendants. We therefore treat Ford's argument as a challenge to the denial of severance.

13

801 F.2d 1437, 1450 (4th Cir. 1986), <u>cert. denied</u>, 480 U.S. 938 (1987). Establishing a right to a closing argument immediately before the commencement of jury deliberations would force the government to prosecute defendants separately; especially where the government has alleged a conspiracy (and has sufficient evidence to support the conspiracy charge), separate trials would be repetitive, inefficient, and expensive.

We hold that a criminal defendant has no right to have his attorney make a closing argument immediately before the jury commences its deliberations. Accordingly, we reject Ford's claim.

B. <u>Motion for Severance</u>

We turn next to the denial of Carlos McGill's motion for severance or a mistrial.

Before trial, the defendants moved for severance, claiming that there was insufficient evidence for the jury to find a single conspiracy of the charged defendants (Count I). The defendants argued that Norman Brown and Paul Winestock, Jr. ran separate operations. The government's theory was that Brown and Winestock headed somewhat independent but interrelated and interacting branches of a large, fluid drug conspiracy. In denying the motion for severance, the district court found sufficient evidence for a jury to find a single conspiracy and allowed the conspiracy charge to go to trial.

Carlos McGill was one of the defendants charged in the conspiracy. About a month into trial, McGill moved for a severance or mistrial and requested the government to explain how the Brown and Winestock groups were connected. McGill insisted that the evidence presented by the government up to that point demonstrated that Brown and Winestock ran separate operations. The government recited the evidence it had so far presented and explained the evidence it would present to connect Brown and Winestock as branches of a single conspiracy. Satisfied with the government's proffer of evidence, the district court denied McGill's motion for severance or mistrial. At the conclusion of the evidence, however, the district court found sufficient evidence to warrant giving the jury a multiple con-

14

spiracy instruction. The jury acquitted the defendants on the conspiracy charge.

Although acquitted of conspiracy, McGill was convicted on one count of distribution of crack cocaine and one count of possession with intent to distribute crack cocaine. On November 7, 1990, McGill gave 53.54 grams of crack cocaine to Sergeant Dade in payment for Winestock's cellular phone. This transaction formed the basis of the distribution charge brought against McGill. On December 5, 1990, the police searched McGill's residence and found 84 grams of crack cocaine inside a safe in his closet. This evidence formed the basis of the possession with intent to distribute charge brought against McGill.

In urging this court to reverse his convictions on the substantive counts, McGill ostensibly argues that the district court erred in denying his motion for severance or mistrial. The substance of his argument, however, is that a material variance occurred because the government indicted the defendants on a single conspiracy but presented evidence of multiple conspiracies. We therefore review McGill's claim first under a "variance" analysis.

A variance occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. United States v. Kennedy, 32 F.3d 876, 883 (4th Cir. 1994), cert. denied sub nom. Ingram v. United States, 115 S. Ct. 939 (1995); United States v. Tarantino, 846 F.2d 1384, 1391 (D.C. Cir.), cert. denied, 488 U.S. 840 & 867 (1988). "In a conspiracy prosecution, a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." Kennedy, 32 F.3d at 883.

The government's theory of the case was that Norman Brown and Paul Winestock, Jr., headed somewhat independent operations but participated in a single, albeit loose-knit, conspiracy. The government presented evidence linking several of the defendants and witnesses to both Brown and Winestock and showing that Winestock occasionally supplied Brown with crack cocaine. The government also showed that the two spoke on the phone on occasion; in one conversation, Winestock asked for Brown's help in obtaining a gun, and in another,

15

Winestock invited Brown to a meeting with his source in Philadelphia. The district court found that the government introduced sufficient evidence to send the conspiracy issue to the jury.

The fact that the jury acquitted the defendants on the conspiracy charge does not demonstrate a material variance. The verdict shows that the jury found the evidence of a single conspiracy lacking, but not that the government's evidence pointed inescapably to the existence of multiple conspiracies. The government tried its conspiracy case and lost, but losing does not in itself create a material variance that undermines the jury's convictions on the substantive counts. A variance occurs when the government produces so little evidence on a charge in the indictment that the charge should not even be sent to the jury.

Even if a variance had occurred, we would still affirm McGill's convictions. "A variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his `substantial rights' and thereby resulted in actual prejudice." Kennedy, 32 F.3d at 883. To show actual prejudice, an appellant must demonstrate that the multiple conspiracy variance created a spillover effect, such that "the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." Id .

McGill was not prejudiced by any variance. The jury easily had the ability to separate the evidence relating to the charges against McGill from the evidence pertaining to the other defendants. See United States v. Edwards, 69 F.3d 419, 433 (10th Cir. 1995) (holding that, in evaluating whether a variance caused a prejudicial spillover, the court considers "whether the proliferation of separate conspiracies in the case affected the jury's ability to segregate each defendant's individual actions and participation"). Direct evidence supported the two charges on which the jury convicted McGill. One count involved a sale of crack cocaine to an undercover police officer. At trial, Sergeant Dade testified to the details of the transaction and identified McGill as the seller. The other count involved crack cocaine that the police found in McGill's apartment during a search. At trial, Special Agents Bryant and Burmeister testified to the search of McGill's residence. Agent Bryant identified the cocaine found in the safe in McGill's closet. Given this direct evidence supporting McGill's con-

16

viction, we conclude that the jury could easily have separated the evidence against McGill from the evidence pertaining to the other defendants.

In fact, we find that the jury demonstrated its ability to sift through the evidence and draw conclusions based on the evidence relevant to each defendant. The jury did not convict all seventeen defendants on all the counts charged against them. The jury acquitted the defendants on the conspiracy counts. It convicted on some of the substantive charges, and acquitted on others. The jury acquitted six defendants on all of the charges brought against them. The verdict reveals that the jury did not convict or acquit the defendants as a group. The jury went through the indictment methodically and reached an independent verdict on each charge.

If we treat McGill's argument as a review of the trial court's ruling on his motion for severance or mistrial, we reach the same conclusion. We review a trial court's ruling on a motion for severance or mistrial under the abuse of discretion standard. United States v. West, 877 F.2d 281, 287-88 (4th Cir. 1989), cert. denied, 493 U.S. 869 & 959 (1989) & 493 U.S. 1070 (1990); see United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir. 1993) (mistrial); United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir.) (severance), cert. denied, 505 U.S. 1228 (1992). For reasons of efficiency and judicial economy, courts prefer to try joint-conspirators together. United States v. Tedder, 801 F.2d 1437, 1450 (4th Cir. 1986), cert. denied , 480 U.S. 938 (1987). The district court found that the government introduced sufficient evidence for a jury to conclude that Brown and Winestock participated in a single, albeit loosely-connected, conspiracy. As it turned out, the jury acquitted all the defendants on the conspiracy counts. Nonetheless, we agree with the district court that the evidence was sufficient for the jury to consider the conspiracy count.

A defendant must show prejudice in order for a trial court's ruling on a motion for severance to constitute an abuse of discretion. United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987), cert. denied, 485 U.S. 934 (1988). No prejudice exists if the verdicts demonstrate that the jury "meticulously sifted the evidence" and "apprais[ed] the independent evidence against each defendant." Id .; see United States v. Alexander, 982 F.2d 262, 266 (8th Cir. 1992) (holding that prejudice

17

exists where the jury was unable to "compartmentalize the evidence" as it related to the separate defendants). As we have already stated, the verdict demonstrated that the jury considered the independent evidence against McGill when it convicted him on the two substantive counts.

We therefore conclude that the district court did not abuse its discretion in denying McGill's motion for severance or a mistrial.

C. Evidentiary Rulings

We next review two evidentiary rulings that affected Robert A. Williams.

Williams was convicted of possession with intent to distribute 117 grams of crack cocaine. The evidence on which Williams was convicted was found in a four-bedroom house at 501 Castlewood Place in Largo, Maryland, where Williams was living. In one of the bedrooms, identified at trial as "bedroom number four," the police found a beeper, Williams' social security card, 7 grams of crack cocaine, and $800 in cash. Another bedroom, identified as "bedroom number two," contained more incriminating evidence: 117 grams of crack cocaine, a loaded .357 Magnum, a cellular phone, and $1803 in cash. Williams claims that he resided in bedroom number four, and that Bernard Langley, another resident of the house, lived in bedroom number two.

During the presentation of the defense's case, Williams requested that Special Agent Wally Borum be recalled to testify that Bernard Langley, and not Williams, occupied bedroom number two where the 117 grams of crack cocaine were found. The district court denied Williams' request. Williams argues that he was prejudiced because the district court denied his request to recall Special Agent Borum.

We review the district court's evidentiary rulings for abuse of discretion. United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993), cert. denied, 114 S. Ct. 1374 (1994). A district court has the discretion to place reasonable limits on the presentation of evidence. Id. (citing United States v. Gravely, 840 F.2d 1156, 1162-64 (4th Cir.

18

1988)). Williams had an opportunity to cross-exam Special Agent Borum when he testified during the government's case. Williams could have presented evidence establishing that Langley lived in bedroom number two and that he lived in bedroom number four. Williams insists that, because of the length and complexity of the trial, he needed to wait until the defense's case to examine Agent Borum so that the jury would not forget the testimony regarding which room Williams occupied. This argument is unavailing, however, because Williams had an opportunity at closing argument to remind the jury of Agent Borum's testimony and to argue that he did not reside in the bedroom where the 117 grams of crack cocaine were found. We conclude that the district court had the discretion to control the presentation of evidence in this complex trial, and that it did not abuse its discretion when it denied Williams' request to recall Agent Borum.

Williams also challenges the government's introduction of evidence of Williams' involvement in a drug transaction not included in the indictment. On April 3, 1990, Robert Williams was arrested along with Maurice Robinson and Gary Chapel in connection with an undercover drug buy. The police found Williams in possession of the marked funds used to purchase the crack cocaine, but they later released Williams without bringing charges. Williams contends that the district court improperly admitted evidence of his past bad acts.

Rule 404(b) of the Federal Rule of Evidence provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). We have held that "other identical instances of criminal activity to that charged in the indictment, occurring reasonably current with the activity charged in the indictment and connected with the very illegal activity which was the subject matter of the indictment, is admissible under the rubric of intent, plan, scheme or design." United States v. Ramey, 791 F.2d 317, 323 (4th Cir. 1986); see United States v. Mark, 943 F.2d 444, 448 (4th Cir. 1991); United

19

States v. Fells, 920 F.2d 1179, 1181-82 (4th Cir. 1990), cert. denied, 501 U.S. 1219 (1991); United States v. King, 768 F.2d 586, 587-88 (4th Cir. 1985). Williams' previous arrest was evidence that he was a seller of crack cocaine during the time of the events charged in the indictment. Given that Williams claimed that he was a user and not a distributor of cocaine, the evidence was relevant to Williams' intent.

We conclude that the district court did not abuse its discretion in the two evidentiary rulings that negatively impacted Williams.

D. Failure to Grant Mistrial

We next consider whether the district court, after learning that a third party had improperly contacted one of the jurors, erred in not granting a mistrial.

After a five-month trial, the jury finally received the case on March 31, 1992, and deliberated for seven court days. On the evening of April 9, the jury informed the court that it had reached a verdict on all counts except for two counts of distribution of cocaine, both of which pertained to Eric Brown. On the morning of April 10, 1992, one of the jurors informed the court that an individual had phoned her the night before wanting to know the status of the deliberations. The district judge spoke with the juror in chambers and, in front of counsel, questioned her extensively about the incident. The juror maintained she could proceed with the deliberations even though the incident had disturbed her.

The government suggested that a mistrial may be in order because it would be unfair to put the juror through the stress of additional deliberations. Eric Brown's attorney asked for a mistrial, which the court indicated it would grant. When the court reconvened, however, Brown's attorney explained he had changed his mind and asked for the jury to continue its deliberations. The district court agreed with the request and did not grant a mistrial on the remaining two counts.

Before the jury returned to its deliberations, the court directed the jury to return a verdict on the counts it had decided. The jury announced it had acquitted on the conspiracy counts and on many of

20

the substantive counts. The jury then returned to its deliberations, and when it returned, it convicted Brown on one of the remaining counts and acquitted on the other.

Brown now claims his counsel failed to represent his wishes in not moving for a mistrial. He alleges he was not informed that his attorney had changed his mind and would request that the jury continue its deliberation. Brown claims that, had he known of his attorney's decision, he would have directed him to request a mistrial. However, when court had reconvened and Brown's attorney had requested that the jury continue its deliberations, Brown did not make his feelings known to the court.

To the extent Brown argues that the district court should have declared a mistrial sua sponte over the attorney's request that the jury continue to deliberate, we review the district court's decision for plain error. United States v. Barnes, 909 F.2d 1059, 1070 (7th Cir. 1990). The plain error standard is appropriate because Brown never communicated to the court that he wanted a mistrial. We conclude that the district court's failure to declare a mistrial did not constitute plain error because the court carefully questioned the juror about the impact of the third party contact and the juror insisted that she could continue to deliberate fairly and objectively. Cf. United States v. Sanders, 962 F.2d 660, 670 (7th Cir.) (district court did not abuse its discretion in allowing the jury to continue deliberations after one of the jurors was threatened because the court carefully inquired into the incident and the juror explicitly testified that she could continue to serve impartially), cert. denied, 506 U.S. 892 & 900 (1992).

To the extent Brown raises an ineffective assistance of counsel claim, we do not reach the issue. A claim of ineffective assistance of counsel is normally considered on collateral review, not on direct appeal. United States v. Grubb, 11 F.3d 426, 441 (4th Cir. 1993). Unless the record conclusively demonstrates ineffective assistance, the defendant should file a 28 U.S.C. § 2255 motion in the district court. United States v. Williams, 977 F.2d 866, 871 (4th Cir. 1992), cert. denied, 507 U.S. 942 (1993). The record in this case does not conclusively demonstrate ineffective assistance.

21

We therefore affirm Brown's conviction for distribution of crack cocaine, although he is free to raise his claim for ineffective assistance of counsel on collateral review.

E. Improper Cross-examination

We next review whether the district court should have granted a mistrial to Michael D. Short for the government's allegedly improper cross-examination of Short's character witnesses.

Short was convicted on one count of distribution, involving a direct delivery of crack cocaine to an undercover agent. At trial, Special Agent Bryant identified Short and testified that on December 19, 1989, Short gave him one half ounce of crack cocaine as payment for Norman Brown's cellular phone service and an additional two ounces in exchange for $1,800 in cash. Because Short was also charged with conspiracy, the government presented other evidence of Short's drug trafficking activities to show his participation in the conspiracy.

As part of his defense, Short called several character witnesses. During cross-examination of some of these witnesses, the government made several improper statements. First, the government asked Cindy Dennison, one of the character witnesses, the following question:

> Q: Were you aware that on December 5, 1990, when agents of the FBI and the Metropolitan Police Department were looking for Mr. Short, to arrest him pursuant to our arrest warrant, that they spoke with Rhonda Short, Mr. Short's sister, and she said, "What do you want him for? I know he does some dealing." Were you aware of that statement?
>
> A: No, I was not.

Short objected to this question because Rhonda Short's statement had never been placed in evidence and the prosecutor's use of the statement constituted hearsay. Second, the government asked Douglas Winkler, another character witness, whether he knew that Short had admitted to purchasing a .44 magnum for $200 on the street; when the

22

witness said that he had not, the government asked him whether his opinion of Short would change if the admission were true. Although Short does not contest the fact that he made the admission, he objected to the question because it asked the witness to give his opinion of Short's character based on an unsubstantiated fact. Cf. United States v. Siers, 873 F.2d 747, 749 (4th Cir. 1989) ("If the witness has not heard of the fact, that is the end of the inquiry, and asking the witness to assume the fact simply has no place in this case."), cert. denied, 506 U.S. 1086 (1993).

The district court sustained the objections and issued limiting instructions to the jury on the following morning. With regard to the question to Ms. Dennison concerning Rhonda Short's statement of her brother's of dealing drugs, the district court instructed the jury to disregard both the question and the answer because "there isn't any evidence that Mr. Short's sister had made any such statement." Similarly, with regard to the question to Mr. Winkler regarding Short's admission that he purchased a gun, the district court instructed the jury to disregard both the question and the answer because "there simply is no evidence before you as to whether Mr. Short ever made any such admission."

Despite these limiting instructions, Short argues that the government's improper questioning prejudiced his defense and that the district court should have granted a mistrial. We disagree. Courts "presume that a jury will follow an instruction to disregard inadmissible evidence presented to it, unless there is an `overwhelming probability' that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be `devastating' to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (citations omitted); see United States v. Jones, 907 F.2d 456, 460 (4th Cir. 1990) ("The jury is generally presumed to be able to follow an instruction to disregard evidence, absent some strong indication that the evidence is so powerful that a jury could not ignore it and that the defendant would be harmed as a result."), cert. denied sub nom., Johnson v. United States, 498 U.S. 1029 (1991).

Short has not shown that the jury could not follow the district court's instruction. Even if we assume, arguendo , that the prosecutor's questions affected the jury so much that the limiting instruction

23

could not cure the prejudice, the questions did not devastate Short's defense. The government presented direct evidence pertaining to the count on which Short was convicted: the jury heard Special Agent Bryant identify Short and testify that he had given him two and one-half ounces of crack cocaine in exchange for $1,800 in cash and Norman Brown's cellular phone payment. Given the clear evidence of distribution, the improper character evidence that the jury heard and was instructed to disregard could not have significantly skewed the jury's judgment on this count. The improper evidence may have affected the jury's judgment on the conspiracy counts, but the jury did not convict Short of conspiracy.

We conclude that the district court did not abuse its discretion in denying Short's motion for a mistrial.

IV.

We next consider the appellants' remaining challenges to their sentences.

A. Sentencing of Norman Brown

Norman Brown received a sentence of life imprisonment under the mandatory minimum sentence provision in 21 U.S.C. § 841(b)(1)(A)(iii). He raises three arguments against his sentence, which we address in turn.

1. Constitutionality of 100 to 1 ratio for crack cocaine

First, Brown challenges the constitutionality of the 100 to 1 conversion ratio between powder cocaine and crack cocaine in the United States Sentencing Guidelines. We have addressed this issue before and have repeatedly affirmed the constitutionality of the sentencing ratio for powder cocaine and crack cocaine against equal protection and due process challenges. United States v. Fisher, 58 F.3d 96, 99-100 (4th Cir.), cert. denied, 116 S. Ct. 329 (1995); United States v. Jones, 18 F.3d 1145, 1151 (4th Cir. 1994); United States v. D'Anjou, 16 F.3d 604, 612 (4th Cir.), cert. denied, 114 S. Ct. 2754 (1994); United States v. Bynum, 3 F.3d 769, 774 (4th Cir. 1993), cert. denied, 114 S. Ct. 1105 (1994). We see no need to repeat this discussion here.

24

2. Number of prior felony convictions

Second, Brown argues that he should not have received a manda-tory life sentence under 21 U.S.C. § 841(b)(1)(A)(iii). That section provides that if a defendant is convicted of an offense involving 50 grams or more of cocaine base and committed "after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ." 21 U.S.C. § 841(b)(1)(A)(iii). Brown had two prior felony convictions resulting from two sales of cocaine to an undercover agent on July 13, 1987 and July 15, 1987. These actions formed the basis for two separate counts of a single indictment. The counts were tried together, Brown was convicted of both, and the court imposed concurrent sentences. Brown argues that the two prior convictions arose from a single act of criminality, and he urges this court to construe them as a single conviction for purposes of sentenc-ing under 21 U.S.C. § 841(b)(1)(A)(iii).

Brown argues that our decision in United States v. Blackwood, 913 F.2d 139 (4th Cir. 1990), supports his position. In Blackwood, the defendant had two previous convictions for possession of large quan-tities of marijuana. The first conviction involved marijuana found in a pickup truck that the defendant was driving when arrested. The sec-ond conviction concerned marijuana found in the defendant's motel room less than two hours later. We held that the two convictions arose from a single act of criminality--the possession with intent to sell marijuana within a limited geographical area and period of time--and should therefore have been treated as one prior conviction for pur-poses of 21 U.S.C. § 841(b). Id. at 145. We recognized that, for pur-poses of 21 U.S.C. § 841(b) and other similar sentencing enhancement statutes, the term "prior convictions" refers to "separate criminal episodes, not separate convictions arising out of a single transaction." Id. at 145-46. Relying on Blackwood, Brown contends that his two prior convictions for distribution of cocaine arose from a single act of criminality, and that his prior convictions should be treated as a single prior conviction.

We disagree. Brown was previously convicted of distribution, not possession. An instance of possession is somewhat amorphous: a sin-gle act of possession may occur over a period of time and in a range

25

of locales. An act of distribution, however, occurs at a distinct time and place. We have held that separate acts of distribution that occur on different days or even at different times on the same day constitute separate criminal episodes. See United States v. Letterlough, 63 F.3d 332, 334-37 (4th Cir.) (two convictions for two acts of distribution of a single dose of crack cocaine occurring less than two hours apart on the same evening constituted two prior convictions for purposes of 18 U.S.C. § 924(e), a similar mandatory minimum sentencing statute), cert. denied, 116 S. Ct. 406 (1995); United States v. Samuels, 970 F.2d 1312, 1315 (4th Cir. 1992) (convictions for two acts of distribution occurring on consecutive days counted as two separate prior convictions for purposes of 18 U.S.C. § 924(e), even though the two convictions had been consolidated for disposition and resulted in concurrent sentences). We therefore conclude that Brown's prior convictions resulted from two separate episodes of criminality and that they constituted two separate convictions for sentencing purposes under 21 U.S.C. § 841(b)(1)(A).

3. Evidence of attributable weight of crack cocaine.

Brown also claims that the evidence attributing 551 ounces of crack cocaine to him was unreliable. Because we affirm the imposition of a life sentence under 21 U.S.C. § 841(b)(1)(A), the calculation of Brown's sentence under the guidelines is irrelevant. We therefore do not review the evidence supporting the calculation of Brown's attributable weight.

B. Sentencing of Jeffrey A. Reid

We have already vacated Jeffrey A. Reid's sentence and remanded for resentencing under criminal history category II. Reid also raises two other challenges to his sentence, which we now address.

1. Rule of lenity

First, Reid challenges the differentiation between cocaine powder and cocaine base inherent in the Sentencing Guidelines. The drug quantity table in U.S.S.G. § 2D1.1 has separate listings for "Cocaine" and "Cocaine Base," such that the penalty for cocaine base is much

26

more harsh than for an equivalent amount of cocaine. The term "cocaine base," however, is not defined by statute or in the Sentencing Guidelines. The term "cocaine" is defined by statute as:

> Coca leaves except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture or preparation which contains any quantity of any of the substances referred to in this paragraph.

21 U.S.C. § 812(c). Reid argues that this definition of "cocaine" includes cocaine base. There is no scientific distinction between powder cocaine and crack cocaine: they share the same chemical properties, molecular weight, and melting point. See United States v. Davis, 864 F. Supp. 1303, 1305 (N.D. Ga. 1994). Reid argues that the failure to define the term "cocaine base" creates an ambiguity in the application of the guidelines.

The rule of lenity provides that a court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended. Bifulco v. United States, 447 U.S. 381, 387 (1980); Ladner v. United States, 358 U.S. 169, 178 (1958). Applying the rule of lenity, Reid argues that the district court should have sentenced him under the Sentencing Guidelines based on the drug quantities applicable to "cocaine," not "cocaine base."

This court recently rejected this argument in United States v. Fisher, 58 F.3d 96 (4th Cir.), cert. denied , 116 S. Ct. 329 (1995). Fisher involved the mandatory minimum sentencing provision of 21 U.S.C. § 841(b)(1)(A), which applies to the possession and distribution of 5 kilograms or more of "cocaine," but only 50 grams or more of "cocaine base." The defendants in Fisher argued that the treatment of cocaine base under the statute was ambiguous because the term "cocaine" includes cocaine base. Asserting the rule of lenity, the defendants implored the sentencing court to apply the lesser of the two penalties.

27

We held that "the only rational interpretation" of the statute was to conclude that the standards for "cocaine" applied to all forms of cocaine except for cocaine base, which had its own harsher penalties. Id. at 99. The rule of lenity does not force us to ignore our common sense. Id. By establishing different standards for cocaine base, Congress clearly intended it to be punished more harshly than other forms of cocaine. In fact, the legislative history of 21 U.S.C. § 841(b)(1)(A) "demonstrates that Congress intended . . . to penalize more severely violations involving crack cocaine." Id.

Based on our clear holding in Fisher, we conclude that the rule of lenity does not require us to ignore the harsher penalties for cocaine base inherent in the Sentencing Guidelines.

2. Alleged inaccuracies in presentence report

Finally, Reid argues that we should remand for resentencing because the district court did not correct alleged inaccuracies in his presentence report. The district court did not address Reid's objections to the report's accuracy because it specifically stated that it was not relying on the accuracy of the report but on its own recollection of the evidence presented at trial. Reid maintains, however, that the district court should have corrected the alleged inaccuracies in the presentence report because the Bureau of Prisons will use that report throughout Reid's incarceration.

Rule 32(c)(1) of the Federal Rules of Criminal Procedure provides that:

> At the sentencing hearing, the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony of other evidence on the objections. For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written

28

> record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

Fed. R. Crim. P. 32(c)(1) (emphasis added). The district court clearly complied with this rule. When Reid raised objections to findings made in the presentence report, the district court stated on the record that "I don't think it is really necessary that we get into that because for purposes of sentencing I am not relying upon in any respect the factual matter that is set out in the presentence report." Transcript of Sentencing Hearing for Jerry Andrew Reid at 7. Given this ruling, it was unnecessary to correct any alleged inaccuracies in the presentence report.

We assume that a written transcript of the sentencing hearing has been appended to the copy of the presentence report made available to the Bureau of Prisons, as required by Rule 32(c)(1). Our holding today does not prevent Reid from arguing in the future that the Bureau of Prisons has not received a transcript of the sentencing hearing.

C. Sentencing of Carlos E. McGill

Carlos E. McGill raises a sufficiency of the evidence claim concerning several kilograms of cocaine base that was attributed to him at sentencing.

The jury convicted McGill for the distribution of 53.54 grams of crack cocaine to an undercover agent, and for possession with intent to distribute 84.3 grams of crack cocaine, which was found at his residence during the execution of a search warrant. At sentencing, the district court found that McGill participated in the efforts of Paul Winestock, Jr., to obtain large quantities of cocaine from a source in Philadelphia, and attributed an additional seven kilograms of crack cocaine to McGill. Although the cocaine obtained by Winestock from Philadelphia came in powder form, the district court treated it as crack cocaine because it found that McGill knew or should have known that the powder cocaine would be converted into crack cocaine before it was sold. The district court stated:

29

I guess I am satisfied that, although perhaps reluctantly so, perhaps I didn't really want to hear it and didn't want to be satisfied, but I can't escape it because I am confident that there has been a preponderance of the evidence to indicate that the seven kilograms from October and November from Mr. McGill's standpoint did involve foreseeability that they would become crack cocaine. It is important that it was crack that he had in his house when he was arrested.

I can't conclude that Mr. McGill stuck his head in the sand with regard to what he foresaw or should have foreseen with regard to the powder that was ultimately cooked into crack. The evidence is just too convincing. It probably really reaches a clear and convincing standard that on this point leaves me with no other conclusion to make on the seven kilograms and of course, that he was convicted with respect to the two counts.

We review the district court's factual findings under a clearly erroneous standard. United States v. Williams, 977 F.2d 866, 869 (4th Cir. 1992), cert. denied, 507 U.S. 942 (1993). We have reviewed the record and conclude that the district court was not clearly erroneous in finding that McGill foresaw or should have foreseen that the seven kilograms of cocaine would be converted into crack cocaine. Consequently, we conclude the district court correctly sentenced McGill.

D. Sentencing of Roderick Brown

Roderick Brown challenges the attribution of 969.56 grams of crack cocaine to him during sentencing.

Brown was convicted on one count of distribution of cocaine to an undercover agent. At sentencing, Brown conceded that two distributions (of 28 grams and of 5 grams) could be attributed to him. The district court also attributed another 969.96 grams of crack cocaine to Brown because of his involvement in "cooking" cocaine powder into crack cocaine. Brown argues that the jury's acquittal on the conspiracy counts indicates their finding that Brown was not involved in cooking drugs.

30

At sentencing, a district court may consider evidence relating to counts on which the defendant was acquitted. United States v. Bernard, 757 F.2d 1439, 1444 (4th Cir. 1985). Even if we assume, arguendo, that the acquittal on the conspiracy count indicates that the jury did not find beyond a reasonable doubt that Brown was involved in cooking cocaine, the sentencing judge need only find by a preponderance of the evidence that Brown was involved in the cooking of cocaine. After reviewing the record, we conclude that the district court was not clearly erroneous in finding that Brown was involved in the conversion of 969.56 grams of powder cocaine into crack cocaine.

V. Jury Selection at the Smith Trial

We next turn to the one issue raised by the defendants at the trial of Hassan L. Smith and Michael S. Smith.

During jury selection, the district court conducted a voir dire examination of the jury pool. Twenty-seven members of the jury pool responded affirmatively when asked if they had previous contact with the criminal justice system. Each one of these 27 members was examined individually at the bench by the district court and by counsel. None of the defendants heard what transpired during the bench conferences. After the completion of voir dire, the court recessed so that counsel could confer among themselves. After the break, counsel submitted their list of peremptory challenges, and the jury was chosen. The district court released the remaining members of the venire and swore in the jury. The court then broke for lunch.

After the lunch break, the defendants' attorneys informed the court that the defendants had voiced their objection to the jury selection process during the lunch break. Specifically, they complained that they were not present at all stages of the jury selection process because they could not hear the discussions that transpired during the bench conferences with individual members of the venire. Furthermore, the defendants complained that their attorneys compiled the list of peremptory challenges without consulting their clients. The defendants requested that the court summon a new venire and select a new jury. The district court denied their request because they objected too late, after the jury had been sworn in.

31

Rule 43(a) of the Federal Rules of Criminal Procedure provides as follows:

> The defendant shall be present at the arraignment, at the time of the plea, <u>at every stage of the trial including the impaneling of the jury</u> and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

Fed. R. Crim. P. 43(a). We agree that the defendants had the right to be present during the bench conferences with the jurors, but we conclude that the defendants waived their right by failing to object before the district court swore in the jury. The Supreme Court has stated:

> The district court need not get an express "on the record" waiver from the defendant for every trial conference which a defendant may have a right to attend. . . . A defendant knowing of . . . a discussion [between a juror and the district judge] must assert whatever right he may have under Rule 43 to be present.

<u>United States v. Gagnon</u>, 470 U.S. 522, 528 (1985). The defendant's obligation to assert expressly his right to be present extends to bench conferences during jury selection. <u>United States v. Washington</u>, 705 F.2d 489 (D.C. Cir. 1983). In <u>Washington</u>, the D.C. Circuit stated:

> In normal cases the defendant upon request should be allowed to observe and hear juror responses made at the bench. But because it is a right infrequently exercised and usually delegated to counsel, unless a specific request is made for the defendant to participate in bench examinations of prospective jurors, such right shall be deemed to have been waived.

<u>Washington</u>, 705 F.2d at 497.

We conclude that the defendants' assertion of their right to be present during the bench conferences was untimely because it came after the district court swore in the jury. See <u>United States v. Romero-</u>

32

Reyna, 867 F.2d 834 (5th Cir.), cert. denied , 110 S. Ct. 1818 (1990). Accordingly, we hold that the Hassan L. Smith and Michael S. Smith were not denied a fair trial.

VI.

For the foregoing reasons, we affirm the convictions of all of the appellants, and we affirm the sentences of all of the appellants except for Jeffrey A. Reid. We vacate and remand Reid's sentence with instructions to resentence him to 324 months imprisonment.

AFFIRMED IN PART AND VACATED
AND REMANDED IN PART

33