**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4613

BROTHERS CONSTRUCTION COMPANY OF
OHIO, INCORPORATED,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4694

TRI-STATE ASPHALT CORPORATION,
Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp Jr., Chief District Judge.
(CR-97-47)

Argued: March 2, 2000

Decided: July 6, 2000

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge Widener and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Elgine Heceta McArdle, THE OFFICE OF MUSSER & MCARDLE, Wheeling, West Virginia, for Appellant Brothers Construction; Stephen Godfrey Jory, JORY & SMITH, Elkins, West Virginia, for Appellant Tri-State Asphalt. Michael D. Stein, Assistant United States Attorney, Wheeling, West Virginia, for Appellee. **ON BRIEF:** David E. Godwin, United States Attorney, Rita R. Valdrini, Assistant United States Attorney, Wheeling, West Virginia, for Appellee.

_____

**OPINION**

TRAXLER, Circuit Judge:

Brothers Construction Company of Ohio, Incorporated ("Brothers") and Tri-State Asphalt Corporation ("Tri-State") were charged in a four-count indictment arising from their involvement in a federally funded highway construction project. Following an eleven-day trial, Brothers and Tri-State were convicted of conspiracy to defraud the United States, see 18 U.S.C.A. § 371 (West 2000); two counts of wire fraud, see 18 U.S.C.A. § 1343 (West 2000); and making a false statement, see 18 U.S.C.A. § 1001 (West 2000). Brothers and Tri-State challenge their convictions and sentences on multiple grounds. We affirm.

I.

In 1994, the West Virginia Department of Transportation, Division of Highways ("WVDOH"), solicited bids for a highway construction project ("the Elm Grove project") that involved approximately $5.2 million in federal and state funds. Federal regulations require contractors on highway construction projects receiving federal assistance to comply with state programs fostering the development of "disadvantaged business enterprises" ("DBEs"). See 49 C.F.R. § 26.13 (1999). Contractors are also required to comply with federal regulations that apply to DBE participation on such a project. A DBE is defined as "a for-profit small business concern -- (1) That is at least 51 percent

2

owned by one or more individuals who are both socially and economically disadvantaged . . . and (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5. African-Americans and women qualify as"socially and economically disadvantaged individuals." 49 C.F.R.§ 26.5.

If an entity is awarded a subcontract as a DBE, it must perform its own work under its own supervision in order for its services to be counted toward the DBE goal. See 49 C.F.R.§ 26.55. In order to preclude the superficial inclusion of a DBE merely"to obtain the appearance of DBE participation," 49 C.F.R. § 26.55(c)(2), funds paid to a DBE contractor count toward the DBE goal "only if the DBE is performing a commercially useful function," 49 C.F.R. § 26.55(c). The regulations elaborate on this requirement as follows:

> A DBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the DBE must also be responsible, with respect to materials and supplies used on the contract, for . . . ordering the material . . . and paying for the material itself.

49 C.F.R. § 26.55(c)(1). Additionally, the cost of equipment leased by the DBE to perform its work may be counted toward the DBE goal. See 49 C.F.R. § 26.55(a)(1).

WVDOH's bid solicitation for the Elm Grove project included a DBE goal of eight percent for the prime contract. Thus, companies bidding on the prime contract were required to subcontract eight percent of the project funds to certified DBEs. Tri-State was awarded the prime contract for the Elm Grove project. In submitting its bid, Tri-State represented to WVDOH that it would meet the DBE requirement, and Tri-State was required to name its DBE subcontractors within twenty days of the award of the prime contract.

Tri-State decided to satisfy part of the DBE requirement by subcontracting the highway underdrain work to a DBE because Tri-State,

3

essentially an asphalt paving company, generally did not perform underdrain work. The most competitive bid on the underdrain subcontract, however, was submitted by Bunn Construction ("Bunn"), a non-DBE. Initially, Tri-State told Bunn that the underdrain subcontract would be awarded to a DBE to satisfy the DBE goal for the Elm Grove project. Bunn persisted, however, offering to locate a DBE subcontractor who would split the underdrain work with Bunn at Bunn's original bid price. Although Tri-State did not normally split the underdrain subcontract between two companies, Tri-State agreed to Bunn's proposal based on Bunn's representation that it would work out the details regarding which portion of the underdrain subcontract the DBE would perform and which portion Bunn would perform and Bunn's representation that it would "coordinate" the work. J.A. 490-91.

Eventually, Charlie Striblin and Chuck Taylor, both of whom were employed by Bunn, contacted Brenda Ware ("Ware"), president of Brothers (a certified DBE), and suggested that Brothers could involve itself in the underdrain work by essentially lending its name to the Elm Grove Project. Striblin explained that he could oversee the project and that Ware could put Bunn employees on Brothers' payroll. Bunn's president, Kermit Bunn, testified that he learned Ware did not want to participate in the Elm Grove project unless she could make $10,000. According to Bunn employee William George, Ware and Kermit Bunn orally agreed in May 1994 that Brothers would "participate" as a DBE in the Elm Grove project in exchange for $10,000. J.A. 300-01. George, who prepared invoices and related documents for Bunn, testified that Bunn was to invoice Brothers for the work Bunn performed and that Brothers, in turn, was to pay each invoice with the progress payments it received from Tri-State. The invoices were to be adjusted so that Brothers would eventually net $10,000.

WVDOH held a pre-construction conference to discuss the Elm Grove project with Tri-State and its subcontractors. Brothers did not send a representative to the meeting. Instead, Kermit Bunn explained the work that Brothers was to perform.

Shortly before the project was to begin, Tri-State notified Kermit Bunn that Bunn Construction was officially a subcontractor on the Elm Grove project, but that Tri-State needed Bunn to explain how the

4

underdrain work was to be split between Bunn and the DBE. Based on information supplied by Kermit Bunn, Tri-State drafted subcontracts obligating Bunn and Brothers to do different portions of the underdrain work. The proposed subcontract between Tri-State and Brothers provided that Brothers would be paid $185,835.20 for its portion of the drainage work. Bunn was to receive $180,944.80 for its portion of the work. After the drainage work was complete, however, the total amount to be paid by WVDOH to Tri-State for the underdrain was reduced by $33,985.80 because the project required fewer linear feet of underdrain than anticipated. In turn, Tri-State was required to pay Brothers $169,487.60 for the work that Brothers was supposed to perform on the Elm Grove project.

Bunn executed the subcontract immediately. Brothers, however, did not sign the agreement, thus delaying the start of construction. At Tri-State's insistence, Bunn attempted to have Ware sign the subcontract so the project could begin; however, construction began on June 13 without a signed subcontract from Brothers.

After the project began, Ware confirmed to Bunn's project manager, Jimmy Collett, that Brothers was being paid to execute the subcontract and lend its name to the project. Brothers' responsibility consisted of creating the payroll for submission to WVDOH and paying the invoices for the materials required for the construction of the underdrain. No Brothers employees appeared on the worksite. Instead, Bunn supplied the workforce that performed Brothers' portion of the underdrain work, as well as its own. Over the course of the Elm Grove project, Collett, Bunn's project manager, acted as Brothers' project "superintendent." J.A. 278. Collett ordered all of the construction materials in Brothers' name and arranged for the delivery of the materials to Bunn's construction office. In fact, Bunn paid for several items directly. He ensured the proper equipment, all of which belonged to Bunn, was available at the job site. And, Collett prepared Brothers' payroll for Ware's signature even though the payroll listed Bunn employees.

On June 18, after the project had been underway for one week, Ware notified Collett that Brothers did not have sufficient funds to make the first payroll. Kermit Bunn directed Collett to have funds transferred from Bunn's account to Brothers' account so that Brothers

5

could meet the payroll. Two days later, however, Ware informed Collett that she would not meet the payroll because she had not been paid the money promised to her, and Ware threatened to shut down the underdrain work. Bunn Construction was forced to pay the workers directly. While the underdrain work was being performed, Brothers did not submit certified payrolls to Tri-State detailing the work that its employees were ostensibly performing on the project.

On June 30, after approximately half of the underdrain work had been completed, Brothers and Bunn entered into a sub-subcontract for the underdrain work. This agreement called for Brothers to subcontract to Bunn the same work that Brothers was supposed to do for Tri-State, i.e., Brothers' part of the underdrain work. Specifically, Bunn was to complete 97,808 linear feet of underdrain and Brothers, in return, would make ten cents per linear foot, which totaled $9,780. Neither Brothers nor Bunn informed WVDOH about the sub-subcontract. Tri-State, the prime contractor, was not immediately notified of this arrangement. According to Dale Russell, Tri-State's superintendent for the Elm Grove project, Tri-State was unconcerned with who performed the subcontract work as long as the work was completed; Tri-State made no effort to ensure that the DBE requirements were met during construction.

The underdrain work was completed on July 13. An inspector for WVDOH made a routine visit to the job site to determine if DBE requirements were being met. Essentially, the inspector was merely attempting to verify that Brothers had in fact done its own work. The inspector became concerned when he failed to observe any Brothers employees and was informed by Bunn's foreman that Bunn was representing Brothers. Moreover, Striblin, a Bunn employee, held himself out to the inspector as a Brothers employee and appeared to be working in a supervisory capacity. The inspector searched the Elm Grove project field office to examine Brothers' payrolls, but could find none. Only Bunn had submitted certified payrolls relating to the underdrain work. Moreover, the WVDOH inspector concluded that the materials invoices had been signed by Bunn employees.

WVDOH contacted Ware and requested that she provide various documents demonstrating that Brothers had actually performed the work and furnished its own equipment, including equipment lease

6

agreements relating to the Elm Grove project and a list of employees. When Brothers failed to respond, WVDOH de-certified Brothers as a DBE but allowed Brothers the chance for reinstatement if it could produce evidence demonstrating that it had done the work using its own employees and equipment. WVDOH also notified Tri-State that because Bunn had apparently performed Brothers' work on the project, Tri-State would fall short of its DBE goal and would be penalized unless it could demonstrate that the DBE requirements had been met. Tri-State's in-house counsel, Robert Samol, ordered that further payments to Bunn and Brothers be withheld, and directed Charles Taylor, Tri-State's estimator for the Elm Grove project, to investigate the matter. Taylor requested that Kermit Bunn provide a written response "clarifying this situation," J.A. 1096, which Taylor would then pass along to WVDOH.

On August 3, Brothers faxed Tri-State copies of the signature pages of what purported to be Brothers' certified payrolls for the Elm Grove project, accompanied by a transmittal page that was addressed to the EEO Division of WVDOH. The signature pages had been signed by Ware, but no Brothers employees were listed on the payrolls. J.A. 1249-57; 836. Ware testified that the fax was inadvertently sent to Tri-State. Whatever the case, on August 11, Ware sent a fax to the WVDOH EEO Division claiming that "Brothers Construction Company of Columbus, Inc., did perform [its] work on the above referenced project, as a subcontractor" and promising to supply "certified payrolls, [and an] equipment lease/rental agreement and manpower utilization report." J.A. 1114.

On August 16, Ware faxed what purported to be Brothers' certified payrolls to the WVDOH EEO Division. The workers listed on these payrolls were identical to the workers listed on Bunn's payrolls for the same period, except that Brothers had added two individuals. These documents were faxed to Tri-State before they were faxed to WVDOH. Brothers also faxed to WVDOH a document purporting to be an agreement signed by Brothers and Bunn under which Brothers leased construction equipment from Bunn. The lease agreement, which Ware drafted, was dated May 15, 1994. However, on August 15 -- the day before Brothers faxed this document to WVDOH -- Brothers faxed an unsigned draft of the document to Tri-State, and then moments later faxed to Bunn a copy that had been signed by

7

Ware on behalf of Brothers. Bunn signed it and faxed it back to Brothers the same day.

On August 22, Tri-State finally responded to WVDOH's letter warning that Tri-State faced possible penalties for failing to meet its DBE goal. Answering on behalf of Tri-State, Samol took the position that Brothers properly performed its work and that"[a]s far as we are concerned, we have met all of the DBE requirements necessary for this project." J.A. 1135. The Government introduced grand jury testimony from Samol that prior to sending Tri-State's response to WVDOH, he learned from Tri-State's supervisor that Brothers never supplied its own independent workforce for the Elm Grove project.

Brothers, Tri-State and Ware were subsequently convicted of conspiracy to commit wire fraud against the United States and to make false statements in a matter within the jurisdiction of the United States Department of Transportation, see 18 U.S.C.A. § 371; wire fraud based on the August 3 exchange of faxes involving the false payroll certifications that were later submitted to WVDOH, see 18 U.S.C.A. § 1343; wire fraud based on the August 15 exchange of faxes to create the purported equipment lease agreement and the August 16 submission of these documents to WVDOH by facsimile, see 18 U.S.C.A. § 1343; and making a false statement in a matter within the jurisdiction of a United States agency based on the August 22 submission of Tri-State's letter to WVDOH representing that Brothers had done all of the underdrain work that it was required to do, see 18 U.S.C.A § 1001. Tri-State was sentenced to pay a fine of $500,000. The district court imposed no fine against Brothers because of the company's insolvency.[1]

II.

Tri-State and Brothers both assert that the district court improperly allowed the grand jury testimony of Robert Samol, who served as an officer and in-house counsel for Tri-State during the Elm Grove project, to be read to the jury at trial.

_____

[1] Ware was sentenced after the corporate defendants. She filed an appeal that is proceeding separately.

8

Samol's written response to WVDOH's August 1 letter indicating that Tri-State would face penalties for falling short of its DBE goal provided the basis for convicting both Tri-State and Brothers for making a false statement in violation of 18 U.S.C.A.§ 1001. In an August 22 letter to Jesse Haynes, Director of the EEO Division for the West Virginia Department of Transportation, Samol wrote on behalf of Tri-State:

> I spoke to the Project Superintendent who advised me that both Brothers Construction and Bunn Construction were performing work on [the underdrain]. This work was completed on July 13, 1994. He saw the same employees perform the installation of the outlet pipe and head walls throughout the whole project. The same employees performed the trenching throughout the project. It was his understanding that Brothers Construction performed the portion of the Subcontract that it was required to perform and that Bunn Construction performed that portion of the project that it was required to perform pursuant to their subcontracts.
>
> As far as we are concerned, we have met all of the DBE requirements necessary for this project.

J.A. 1134-35. Based on this letter, Count 4 of the Indictment charged Tri-State with knowingly and willfully making a false representation that Brothers performed the work it was required to perform on the Elm Grove project and concealing the fact that Brothers had sub-subcontracted to a non-DBE all of the work that it was supposed to perform. Brothers was charged with aiding and abetting the violation of section 1001.

The Government called Samol as a witness at trial, but he invoked his rights under the Fifth Amendment and refused to testify. Therefore, to demonstrate that Tri-State knew this letter contained false representations, the Government proffered Samol's grand jury testimony that, prior to sending the August 22 letter, Samol knew that "the same employees performed the work throughout the whole project," J.A. 443, and that "there was no distinction between Brothers and Bunn employees." J.A. 437. The district court admitted the grand jury testi-

9

mony under the residual hearsay exception contained in Rule 804(b)(5) of the Federal Rules of Evidence.**2**

The Confrontation Clause of the Sixth Amendment does not bar the use of hearsay statements against a criminal defendant. See Maryland v. Craig, 497 U.S. 836, 847-48 (1990) (explaining that the Confrontation clause "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial"); see also White v. Illinois, 502 U.S. 346, 353-54 (1992) (observing that "hearsay rules and the Confrontation Clause are generally designed to protect similar values and stem from the same roots" (citation and internal quotation marks omitted)). When the hearsay at issue consists of statements made during prior judicial proceedings, the Confrontation Clause requires that the Government "produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Ohio v. Roberts, 448 U.S. 56, 65 (1980); see White, 502 U.S. at 354. Additionally, the Government must show that the prior testimony it proposes to use "bears `indicia of reliability' sufficient to enable the factfinder to evaluate the truth of the hearsay." United States v. McHan, 101 F.3d 1027, 1037 (4th Cir. 1996); see Roberts, 448 U.S. at 65-66. If the statement "falls within a firmly rooted hearsay exception," then "no independent inquiry into reliability is required." Bourjaily v. United States, 483 U.S. 171, 183 (1987) (internal quotation marks omitted). However, statements admitted under Rule 804(b)(5), the residual exception to the hearsay rule, will be deemed sufficiently reliable only if the Government makes a "`particularized' showing of trustworthiness." McHan, 101 F.3d at 1037. **3** We review a district court's factual finding regarding the reliability of the prior statement or testimony for clear error. See McHan, 101 F.3d at 1038.

_____

**2** Shortly after the conclusion of the trial, Rule 804(b)(5) was consolidated with the other residual hearsay exception, Rule 803(24), in Federal Rule of Evidence 807. The text was not altered in any material way because "[n]o change in meaning [wa]s intended." Fed. R. Evid. 807 advisory committee's note.
**3** The relevant portion of Rule 804(b)(5), now Rule 807, provides for the admission into evidence of a "statement not specifically covered by [another Rule] but having equivalent circumstantial guarantees of trustworthiness."

10

Tri-State and Brothers do not quarrel with the district court's determination that Samol was unavailable because he invoked the Fifth Amendment. The district court also concluded that Samol's grand jury testimony was sufficiently reliable:

> [T]estimony in a grand jury proceeding [is] given in a solemn setting of the grand jury under oath and which carries with it the possibility of a perjury charge if the witness knowingly testifies falsely. And in here, the testimony was recorded verbatim, minimizing the risk of error or intimidation by the United States. The grand jury was allowed to question Mr. Samol to explore his testimony and credibility. . . . I have never seen . . . the grand jurors ask[] so many questions of a witness, some of them were pretty good questions, too, and, furthermore, Mr. Samol voluntarily went to the grand jury and agreed to be truthful and waived his Fifth Amendment privilege.
>
> Consequently, I will find that there is an indicia of trustworthiness.

Tr. 1149-50. Tri-State and Brothers take issue with the district court's finding that Samol's grand jury testimony was reliable.

In McHan, we observed that "[t]he nature of grand jury testimony . . . provides some indicia of trustworthiness" because it "is given in the solemn setting of the grand jury, under oath and the danger of perjury, and in the presence of jurors who are free to question witnesses and assess their credibility and a court reporter who prepares an official transcript of the testimony." 101 F.3d at 1038. Although these general observations apply, they do not necessarily render Samol's grand jury testimony admissible. McHan, in fact, rejected the idea that grand jury testimony is sufficiently reliable per se and cautioned that we are required to consider "the totality of the circumstances" for "particularized guarantees of trustworthiness." Id. (internal quotation marks omitted).

Brothers and Tri-State contend that Samol's grand jury testimony was particularly suspect because, following Samol's appearance before the grand jury, the Government began an investigation to

11

determine whether Samol committed perjury through the very same grand jury testimony the Government sought to introduce. At oral argument, the Government acknowledged that it considered bringing perjury charges against Samol, but not because Samol testified that he was aware that the same group of workers performed the underdrain work in its entirety. According to the Government, the perjury investigation stemmed from Samol's grand jury testimony that he had not seen the Brothers-Bunn sub-subcontract prior to sending the August 22 letter. This testimony contradicted testimony from another Tri-State employee that, in fact, Samol had seen the sub-subcontract. Whatever the reason for the investigation, we have serious reservations about the reliability of testimony which, at least in part, the Government finds so untrustworthy that it would consider bringing perjury charges. Thus, we cannot conclude that Samol's grand jury testimony was properly admitted under Rule 804(b)(5).

It is not apparent from the record whether the district court admitted the grand jury testimony on the alternative basis that it was an admission by a party and thus was not hearsay pursuant to Rule 801(d)(2)(A). We can affirm, however, "`on any legal and factual basis fairly presented in the district court.'" Adventure Communications, Inc. v. Kentucky Registry of Election Fin. , 191 F.3d 429, 439 n.9 (4th Cir. 1999) (quoting PHP Healthcare Corp. v. EMSA Ltd. Partnership, 14 F.3d 941, 945 (4th Cir. 1993)). With respect to Tri-State, we conclude Samol's grand jury testimony was admissible as an admission by a party.

The Constitution generally does not forbid the use of a criminal defendant's own grand jury testimony against him in a subsequent prosecution. See United States v. Washington, 431 U.S. 181, 187 (1977). Likewise, the rule against hearsay testimony is usually no impediment to the use of such testimony. The grand jury testimony of a criminal defendant falls within the purview of Rule 801(d)(2), which excludes various party admissions from the definition of hearsay. See, e.g., United States v. Slone , 833 F.2d 595, 601 (6th Cir. 1987) (affirming the admission pursuant to Rule 801(d)(2) of criminal defendant's testimony before the grand jury); United States v. Heffington, 682 F.2d 1075, 1082 (5th Cir. 1982) (same); United States v. Rios Ruiz, 579 F.2d 670, 675-77 (1st Cir. 1978) (same). Because a corporation can act only through its employees, a statement by a cor-

12

porate official such a Samol can certainly be considered an admission by a corporate defendant. Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The corporation's agent need not have authority to make the statement at issue, but rather the subject of the statement must relate to the employee's area of authority. See Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 619 (4th Cir. 1991). At the time of his grand jury testimony, Samol still served as an officer for Tri-State. His testimony related to his role in the Elm Grove project and how he responded, as both an officer and in-house counsel, on behalf of Tri-State to WVDOH's investigation. These were clearly matters that were within the scope of Samol's employment at Tri-State. Thus, we conclude that Samol's grand jury testimony was admissible against Tri-State as an admission under Rule 801(d)(2)(D).

Brothers contends that the admission of Samol's testimony abridged its rights under the Sixth Amendment "to be confronted with the witnesses against [it]." U.S. Const. amend. VI. We conclude that even if the admission of this testimony was erroneous as to Brothers, it was harmless. See Idaho v. Wright, 497 U.S. 805, 823 (1990) (applying harmless error review to Confrontation Clause violations); Fed. R. Crim. P. 52(a). Although the Government suggested at oral argument that this testimony was "essential" to its case for making a materially false statement, we are not bound by the Government's characterization of the evidence. "[I]n order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997) (brackets in original) (internal quotation marks and citations omitted).

In view of the evidence presented by the Government, we are satisfied that the outcome of the trial, and Brothers' conviction pursuant to § 1001 in particular, was not influenced substantially by the introduction of Samol's grand jury testimony. In response to an August 1, 1994, letter from the WVDOH's EEO Division that indicated Brothers was to be decertified as a DBE because Bunn had performed

13

Brothers' work on the Elm Grove project, Brenda Ware created a number of documents designed to support the fiction that Brothers had, in fact, fulfilled its obligations under its subcontract with Tri-State. Ware acknowledged that on August 3, Brothers faxed to Tri-State copies of what purported to be Brothers' certified payrolls, signed by Ware, for the underdrain work, along with a transmittal page that was addressed to the EEO Division of WVDOH. The fax, however, did not include a list of Brothers' employees who worked on the Elm Grove project. On August 16, Brothers sent Tri-State another fax of the certified payrolls which listed workers this time. Brothers' list of Elm Grove employees was identical to Bunn's crew, except that two workers were added. Additionally, Ware acknowledged that two drafts of a purported equipment lease agreement between Brothers and Bunn were faxed to Tri-State on August 15. The first document was an unsigned draft of the agreement. The second document, which was faxed minutes later, was identical to the first, except that it had been signed by Ware on behalf of Brothers. The evidence established that these facsimile transmissions were sent to a fax machine located on the same floor as Samol's office. Less than one week later, Samol sent to WVDOH the August 22 letter which referred to the completed version of Brothers' certified payroll and represented that Brothers had performed the work it was required to perform pursuant to its subcontract with Tri-State.

Samol's grand jury testimony did not amplify the evidence of Brothers' role in the conspiracy, nor did it provide additional evidence that Brothers aided and abetted Tri-State's false representation that Brothers had pulled its own weight on the Elm Grove project. To the extent that Samol mentioned Brothers or Ware during his grand jury testimony, the testimony was, at worst, cumulative. For example, Samol acknowledged that a number of phone calls, perhaps as many as ten, had been made between Brothers and Tri-State after WVDOH notified Tri-State that it was not in compliance with the DBE requirement for the Elm Grove project, but before Samol sent his August 22 letter. Samol explained that he had not participated in any of the calls, but he understood that Ware was trying to supply support for the claim that Brothers had performed its work. Samol's testimony, however, was hardly the only evidence on this issue. The Government introduced telephone records establishing that Brothers and Tri-State made a flurry of telephone calls to each other during this period. The

14

Government introduced evidence, and Ware even admitted, that documentation to support her position that Brothers satisfied the DBE requirements was faxed to Tri-State shortly before Samol sent the August 22 letter.

Samol also testified regarding his understanding of whether Brothers had complied with the DBE requirements. During this portion of his testimony, Samol acknowledged that "[i]f Brothers['] certified payrolls were legitimate, the State would have to be wrong in saying that Brothers did not have employees working on the job." J.A. 431. On this point, Samol's testimony was nothing new. The Government examined two witnesses at length regarding the requirement that Brothers must perform its own work. Moreover, the payrolls created by Ware were introduced into evidence, along with the payrolls submitted by Bunn. The two sets of payrolls were virtually identical (except for the addition of two individuals on Brothers' payroll), a fact that Ware admitted at trial. Significantly, Samol never testified that Brothers failed to perform its work on the Elm Grove project; if anything, Samol implied the opposite, or at least that, as far as he knew, Brothers did not necessarily act improperly. **4**

On the whole, our review of Samol's testimony reveals no significant additional evidence that the jury would have considered in convicting Brothers of conspiracy to defraud the United States or of aiding and abetting the violation of section 1001. Accordingly, we conclude that the district judge did not commit a reversible error in permitting Samol's grand jury testimony to be read to the jury.

III.

Tri-State and Brothers both challenge the sufficiency of the evidence to sustain a conviction against them on any of the four counts included in the indictment. When assessing the sufficiency of the evidence of a criminal conviction on direct review,"[t]he verdict of [the]

_____

**4** For instance, Samol testified that "I did not know if the Bunn employees . . . were hired by Brothers . . . to perform various portions of the work. And based upon . . . what I had examined there was a certification from Brenda Ware at Brothers Construction, that these employees were her employees who performed the work." J.A. 440.

jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

Construing both direct and circumstantial evidence in the light most favorable to the Government, it is sufficient to support the jury verdicts that Brothers and Tri-State engaged in a conspiracy to defraud the United States by misrepresenting to WVDOH that Brothers performed work on the Elm Grove highway construction project. In light of our previous review of the evidence adduced at trial, we will summarize only briefly here. Following completion of the underdrain work, Tri-State learned that Bunn had performed all the work pursuant to a sub-subcontract between it and Brothers. Tri-State then received documents prepared by Brothers showing that Brothers intended to misrepresent to WVDOH that it had performed work on the underdrain item. With this knowledge, Tri-State sent a letter to WVDOH representing that Brothers had completed its portion of the underdrain work necessary to satisfy the DBE requirements of the project. The numerous communications via telephone and facsimile between Tri-State, Brothers, and Bunn that occurred after the completion of the underdrain work provide additional evidence of a conspiracy to defraud the Government about who actually performed the work.

The evidence is also sufficient to sustain the defendants' convictions for wire fraud. Brothers and Tri-State used interstate wire communications to send and receive fraudulent documents that were either submitted to WVDOH or used in connection with their scheme to defraud WVDOH. In light of the evidence presented at trial, a reasonable jury could have rejected the explanation offered by Brothers that copies of the certified payroll information prepared by Brothers were faxed to Tri-State by mistake and concluded instead that the faxes were intentionally sent to Tri-State to further the scheme to defraud WVDOH.

Finally, the letter sent to WVDOH by Samol, on behalf of Tri-State, representing that Brothers performed its contractual obligations, coupled with Samol's grand jury testimony, provided sufficient evidence upon which the jury could find that Tri-State knowingly made a false representation. Likewise, the numerous facsimile transmis-

16

sions from Brothers to Tri-State shortly before Samol's letter was sent to WVDOH, coupled with the letter itself, were sufficient to permit a jury to convict Brothers for aiding and abetting the making of a false representation.

## IV.

Next, both Tri-State and Brothers contend that they were deprived of a fair trial as a result of prosecutorial misconduct and argue that the district court erred in refusing to grant their motion to dismiss the indictment, which they renewed during and after trial. Our analysis is two-fold: we must first determine whether the challenged conduct was improper; if so, then we must ascertain whether the improper conduct prejudicially affected the defendants' substantial rights so that the defendants were deprived of a fair trial. See United States v. Wilson, 135 F.3d 291, 297 (4th Cir.), cert. denied, 523 U.S. 1143 (1998). Tri-State and Brothers allege that the prosecution engaged in misconduct in three ways.

### A.

First, Tri-State and Brothers contend that the Government improperly continued to investigate the case after the indictment was returned on August 7, 1997. In particular, they challenge the propriety of recalling various witnesses, who would later testify at trial, to appear before the grand jury between the time the indictment was returned and the commencement of trial. Dale Russell, Tri-State's Elm Grove project superintendent, was recalled to testify about various telephone calls between him and Samol. Chuck Taylor, Tri-State's estimator for the project, was recalled and asked questions relating to whether Taylor and Samol discussed the fact that Brothers had sub-subcontracted its work to Bunn. Brothers and Tri-State allege that Russell and Taylor changed their testimony during their second appearance before the grand jury. The significance, they insist, is that the Government used the grand jury process to elicit more favorable testimony, which Russell and Taylor then repeated at trial.[5]

_____

[5] Brothers and Tri-State argue that the Government's abuse of the grand jury is evidenced from the fact that the district judge excluded the

17

In response, the Government relies on its representations to the trial court -- that Russell and Taylor were called to provide grand jury testimony a second time in connection with the investigation of Samol for committing perjury during his grand jury testimony. Brothers and Tri-State argue that the Government's claim that Samol was being investigated for perjury is a mere ruse because the Government claimed at trial that Samol's perjury occurred during his pretrial debriefing, which took place after the second grand jury session. It is clear from the record, however, that the Government was investigating "the question of whether Mr. Samol had committed perjury in his testimony before [the grand jury]." J.A. 170.

We recognize the "universal rule that prosecutors cannot utilize the grand jury solely or even primarily for the purpose of gathering evidence in pending litigation." United States v. Moss, 756 F.2d 329, 332 (4th Cir. 1985). Therefore, once a criminal defendant has been indicted, the Government is barred from employing the grand jury for the "sole or dominant purpose" of developing additional evidence against the defendant. Id. (internal quotation marks omitted). However, a "`presumption of regularity attaches to a grand jury's proceedings,'" id., and Brothers and Tri-State bear the burden of rebutting the presumption. The Government is allowed to make a good-faith inquiry into charges that are not covered in the indictment, "even if it uncovers further evidence against an indicted person." Id. (internal quotation marks omitted). We will reverse the factual findings of a district court regarding the Government's purpose for calling post-indictment witnesses to appear before the grand jury only if the findings are clearly erroneous. See id.

Before trial, the district court found that the Government did not call Russell and Taylor to reappear before the grand jury solely or primarily for obtaining additional evidence to use against Tri-State or Brothers. Accordingly, Russell and Taylor were permitted to testify

_____

testimony of certain witnesses based on his perception that their "grand jury testimony seems to impart some things that may very well be considered discovery." J.A. 342. Because the witnesses were excluded, we conclude that any post-indictment discovery provided did not strip Brothers or Tri-State of a fair trial. See Wilson, 135 F.3d at 297.

18

at trial; however, the district court restricted the Government from impeaching the witnesses with testimony from their second grand jury appearance and from examining them as to such testimony.

We conclude that the district court did not clearly err in finding that the Government's primary purpose in recalling Russell and Taylor before the grand jury was not to conduct discovery with respect to the charges pending against Tri-State and Brothers. The investigation of Samol for a possible perjury charge is a logical result of Samol's testimony that he did not have knowledge of critically important documents despite his position as in-house counsel for Tri-State -- testimony that contradicted the original grand jury testimony of Taylor. Because the Government was permitted to investigate charges that were not included in the indictment, as it was doing when it recalled Russell and Taylor, we find no impropriety.

B.

Next, Brothers and Tri-State contend that shortly before trial, the Government issued target letters to certain trial witnesses informing them that they were subjects of the grand jury's on-going investigation. Brothers and Tri-State do not dispute the Government's assertion that only two witnesses, Kermit Bunn and Charles Striblin, received target letters. The thrust of this argument is that the Government used the target letters to coerce favorable testimony from the witnesses.[6] Brothers and Tri-State also argue that the Government identified three other witnesses (Taylor, Russell and Greg Kilpatrick) as unindicted co-conspirators for coercive purposes as well. Brothers and Tri-State have failed to show us how these witnesses were coerced into changing their testimony to suit the Government or that the Government intimidated any of these witnesses into refusing to testify at trial. We reject the use of these target letters as a basis for prosecutorial misconduct.

_____

[6] Brothers and Tri-State also contend that the Government coerced Samol into asserting his Fifth Amendment rights at trial, which caused him to be unavailable and resulted in the admission of his grand jury testimony. As we discussed previously, the admission of Samol's testimony was, at worst, harmless error as to Brothers. With respect to Tri-State, the testimony was properly admitted in any event.

19

C.

Finally, Brothers and Tri-State seek a remand to district court for additional fact finding based on what they contend is "new" evidence of prosecutorial misconduct, discovered well after the conclusion of trial. Tri-State's president Glen Straub testified on behalf of Tri-State during its sentencing hearing. As a result of that testimony, Straub was indicted for making a false statement. See 18 U.S.C. § 1623 (West 1984 & Supp. 2000). Straub was represented by the same attorney who represented Tri-State. During the course of Straub's prosecution, counsel made a request under the West Virginia Freedom of Information Act (FOIA), see W. Va. Code§ 29B-1-1 to -7 (Michie 1998), and obtained an audit file, assembled by WVDOH, on the Elm Grove project.

Although the Government had disclosed a report (which Tri-State introduced as an exhibit at trial) from the audit file summarizing the audit conducted on the Elm Grove project, it did not disclose the existence of an audit file during the prosecution of Brothers and Tri-State.

Tri-State and Brothers assert that the audit file contains material that should have been turned over to Brothers and Tri-State in this case under the Jencks Act, see 18 U.S.C.§ 3500 (West 1985), and Brady v. Maryland, 373 U.S. 83, 87 (1963).[7] In particular, Brothers and Tri-State point to notes taken by WVDOH personnel during an interview of Brenda Ware that allegedly differ from a summary of the interview given at trial. Also, they contend that the audit file summarized statements made by Jesse Haynes, the Director of WVDOH's EEO Division who was called by the Government to explain the DBE requirements to the jury, indicating that he did not believe that it was necessary to refer the Elm Grove matter to federal officials with respect to Brothers. Based on this information, Straub moved to dismiss his indictment because of prosecutorial misconduct, alleging that documents from the internal audit file should have been turned over pursuant to Brady and the Jencks Act. The district judge denied this

_____

[7] In Brady, the Court held"that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

20

claim and refused to dismiss Straub's indictment. **8** In ruling on Straub's motion, the district court observed in passing that the investigation and prosecution of Brothers and Tri-State "could have been conducted more professionally, more carefully and with more diligence on the part of the [AUSA] assigned . . . to the Brothers Construction Company case."

Because we conclude that the Brady and Jencks Act claims clearly lack merit, we need not remand for additional fact finding. To establish a Brady claim, the defendant must demonstrate three things: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether wilfully or inadvertently; and (3) it must be material." Spicer v. Roxbury Correctional Inst., 194 F.3d 547, 555 (4th Cir. 1999). However, "`the Brady rule does not apply if the evidence in question is available to the defendant from other sources,'" United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (quoting United States v. Davis, 787 F.2d 1501, 1505 (11th Cir. 1986)), either directly or via investigation by a reasonable defendant, see Barnes v. Thompson, 58 F.3d 971, 975 n.4 (4th Cir. 1995). The defendants do not dispute the Government's assertion that the WVDOH internal audit file on the Elm Grove project was available through sources other than the Assistant United States Attorney. Indeed, Straub's counsel -- who also represented Tri-State -- was able to obtain the information by making a FOIA request. And, it is readily apparent from the audit report itself, which is merely a summary of the audit of the Elm Grove project, that the audit was based, at least in part, upon documents maintained and collected by the WVDOH. A reasonable defendant would have concluded-- as counsel did later when he filed an FOIA request -- that there were additional audit materials.

Furthermore, we have not been informed as to how the notes regarding the Brenda Ware interview are exculpatory as to Brothers or Tri-State -- we have only been advised, in the broadest terms, that there are notes of an interview of Brenda Ware that "differ" from a summary of the interview given by a government witness at trial.

_____

**8** Straub's indictment was later dismissed voluntarily by the Government.

21

And, Tri-State has not explained how Haynes' alleged statements would be exculpatory as to it. We also fail to see how the "new evidence" would be material since it would not, in our view, "put the whole case in such a different light as to undermine confidence in the verdict." Spicer, 194 F.3d at 559 (quoting Strickler v. Greene, 527 U.S. 263, 290 (1999)) (internal quotation marks omitted). We do not perceive a Brady violation here.

Likewise, we conclude that the claim made pursuant to the Jencks Act is without merit. The Jencks Act requires the Government to turn over any statement of a witness in its possession once the witness has testified on direct examination, provided the statement relates to the testimony of the witness. See 18 U.S.C.A.§ 3500(b). The Act defines a "statement" to include a written statement that has been signed or adopted by the witness or a transcription of an oral statement of a witness that is substantially verbatim. See 18 U.S.C.A. § 3500(e). There is nothing before us indicating that the "new" evidence would constitute witness statements as defined by the Jencks Act. The purported Jencks material in our case consists of interview notes compiled by government agents during an interview of Ware and summaries of statements made by a government witness. Brothers and Tri-State do not suggest that any of this evidence was adopted by the witnesses as their own statements, nor do they claim that these notes or summaries amount to verbatim transcriptions. See United States v. Hinton, 719 F.2d 711, 722 (4th Cir. 1983) (recognizing that the Government is not required to disclose rough interview notes that later become part of a final report). We do not detect a viable basis for the claim that the Government violated the Jencks Act. Accordingly, we conclude that Brothers and Tri-State were not deprived of a fair trial as a result of prosecutorial misconduct.

V.

Tri-State next attacks its sentence, arguing that the district court erroneously imposed a three-level enhancement for obstruction of justice. See United States Sentencing Guidelines Manual ("U.S.S.G.") § 8C2.5(e) (1997). The district court followed the recommendation contained in the presentence report that Tri-State receive a three-level obstruction of justice enhancement pursuant to section 8C2.5(e) based on Samol's August 22 letter asserting that Brothers had performed its

22

work, and also based on Samol's grand jury testimony, which the sentencing court found to be perjurious. Tri-State asserts that neither basis is sufficient to support the imposition of an obstruction of justice enhancement.

First, Tri-State contends that the use of Samol's August 22 letter constitutes double counting because the sending of the August 22 letter was the act for which Tri-State was convicted on Counts one (conspiracy to defraud the United States) and four (making a false statement) of the indictment. This argument, however, is of no aid to Tri-State because the district court identified another separate, independent basis for applying the obstruction of justice enhancement: Samol's grand jury testimony. Because we conclude that Samol's grand jury testimony provided a sufficient factual basis to support the obstruction of justice enhancement, we need not consider Tri-State's argument that the district court engaged in double counting when it considered Samol's August 22 letter for sentencing purposes.**9**

Next, Tri-State argues that the obstruction of justice enhancement was improper in any event because Samol's grand jury testimony was largely consistent with the testimony of other trial witnesses. Thus, Tri-State's argument is essentially that the district court made an erroneous factual determination that Samol had testified falsely at the grand jury. We review a district court's application of the guidelines, to the extent such application depends primarily upon findings of fact, for clear error. See United States v. France, 164 F.3d 203, 209 (4th Cir. 1998), cert. denied, 507 U.S. 1010 (1999).

The district court concluded that Samol's grand jury testimony was false "as to a material fact and was wilfully[given] in order to obstruct justice." J.A. 983. We cannot say that this conclusion was clearly erroneous. The trial testimony of two Tri-State employees contradicted Samol's grand jury testimony. Chuck Taylor testified that, after Tri-State received a letter from WVDOH indicating that Tri-State was not going to meet its DBE requirement because Broth-

_____

**9** For this reason, we also reject Tri-State's contention that the August 22 letter cannot support an obstruction of justice enhancement under § 8C2.5(e) because the letter was not sent"during the investigation, prosecution, or sentencing of the instant offense."

23

ers had not performed its work, Samol directed Taylor to look into the matter; Samol denied doing so. Taylor also testified that he and Samol discussed the sub-subcontract between Bunn and Brothers before Samol sent the August 22 letter indicating the DBE requirement had been satisfied; Samol denied knowledge of the sub-subcontract before sending the letter. The record provides a basis upon which the district court could reasonably conclude that Samol obstructed justice by falsely testifying before the grand jury. We affirm the district court's application of the obstruction of justice enhancement.

VI.

Brothers and Tri-State argue that the sentencing court should not have attributed any loss to their conduct. According to the guidelines, "[i]n a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1, application note 7(d). Brothers and Tri-State emphasize the fact that, after WVDOH determined that Brothers had not contributed any work to the Elm Grove project, Tri-State was permitted to use Hodges and Company, a certified DBE, to perform additional work on the Elm Grove project (apparently at no additional cost to the Government) that was counted toward the DBE requirement. Moreover, WVDOH counted excess DBE "credit" from other Tri-State projects toward the satisfaction of the DBE goal. In the end, Tri-State was credited as having satisfied the DBE requirement on the Elm Grove project. Thus, Brothers and Tri-State contend that the required percentage of project funds went to a certified DBE and all of the work was performed, i.e., WVDOH received exactly what it bargained for. Therefore, Brothers and Tri-State claim no loss can be attributed to their conduct because the federal benefits eventually reached the intended recipient -- a qualified DBE.

We review de novo the district court's legal determination of whether any loss can be attributed to Brothers or Tri-State. See United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995). We conclude that there was certainly loss as contemplated by the guidelines. A substantial sum of money -- initially $185,835.20-- was earmarked for DBE project participation by Brothers. Despite the fact that the DBE goal was met, the funds were not put to the intended use -- to compensate Brothers for its work on the underdrain construction.

24

Moreover, Tri-State and Brothers conspired in a scheme that was intended to divert this money to Bunn, a non-DBE. If not for the audit that revealed Brothers' failure to participate, the DBE funds would not have eventually reached a DBE. These facts demonstrate a loss under § 2F1.1 of the guidelines because the conspiracy would have diverted the funds entirely from any DBE but for the audit. See U.S.S.G. § 2F1.1 comment. n.7 ("[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."); United States v. Brown, 151 F.3d 476, 489 (6th Cir.), cert. denied, 525 U.S. 1026 (1998); United States v. Stockheimer, 157 F.3d 1082, 1089 (7th Cir. 1998), cert. denied, 525 U.S. 1184 (1999). Accordingly, we conclude that the district court properly determined that economic loss can be attributed to both Brothers and Tri-State.

VII.

Finally, Tri-State contends that, even if monetary loss is attributable to Tri-State's conduct during the Elm Grove project, it was still erroneously sentenced because the district court improperly calculated the amount of loss attributable to it. The presentence report determined that the conduct of Brothers and Tri-State inflicted a loss in the amount of $185,835.20. The presentence report stated specifically that this figure reflected the amount that Tri-State was contractually obligated to pay Brothers for its work on the underdrain. At sentencing, Tri-State objected to a loss determination as a general matter, arguing that no loss whatsoever should be attributed to it, a position which, as we explained above, the district court rejected. Tri-State, however, did not object to the specific loss figure arrived at in the presentence report, nor did Tri-State challenge the report's assertion that Tri-State was contractually obligated to pay Brothers $185,835.20.

Predicated on its finding that $185,835.20 served as an appropriate amount of loss, the district court determined that Tri-State's fine range was $334,503.36 to $669,006.72[10] and set Tri-State's fine at

_____

[10] The guideline fine range is determined by multiplying the base fine determined under § 8C2.4 by the applicable minimum and maximum multipliers set forth in § 8C2.6. See U.S.S.G. § 8C2.7. The appropriate

25

$500,000. No fine was imposed upon Brothers because of its inability to pay.

Subsequently, the Government discovered that Tri-State and WVDOH had entered into a supplemental contract on July 25, 1994, which was shortly after the underdrain work had been completed. This supplemental agreement reduced the amount of work that Tri-State was required to subcontract to a DBE. As a result, the Government filed a sentencing memorandum in Ware's case, which was still ongoing, indicating that the correct amount to be paid to the DBE on the underdrain item was $169,487.60 and representing that, of this amount, at least $146,710.52 was diverted away from the DBE program.[11] Finally, on May 17, 1999, the district court sentenced Ware. In doing so, the court determined that the amount of loss attributable to Ware's conduct under the guidelines was $146,710.52. However, the district court concluded that this amount would overstate the seriousness of the offense and departed downward based upon a loss amount of $10,000, which the district court determined more accurately reflected the loss attributable to Ware.

Tri-State makes two contentions. First, Tri-State argues that the amount of loss attributed to it must be identical to that attributed to its co-conspirator Ware. Tri-State, however, misapprehends what occurred at Ware's sentencing when it contends that $10,000 must necessarily be the loss attributed to Tri-State. The district court concluded that, under the guidelines, the appropriate amount of loss attributable to Ware was $146,710.52 (the exact amount which the Government now contends was diverted away from the DBE pro-

_____

multipliers are based on the corporate defendant's culpability score determined under § 8C2.5. See U.S.S.G. § 8C2.6. In sentencing Tri-State, the district court adopted the guideline application contained in the presentence report. Thus, the court established Tri-State's base fine at $185,835.20, see U.S.S.G. § 8C2.4(a), and its maximum and minimum multipliers were based on a culpability score of 9, which Tri-States does not challenge.

[11] Portions of this argument were presented to this panel in a motion for a remand to district court for resentencing. We deferred ruling on the motion, and we dispose of it here.

26

gram). The sentencing court arrived at the $10,000 amount of loss only after concluding that a downward departure was warranted because the guideline amount overstated the seriousness of Ware's individual conduct. Thus, for Tri-State to argue that it is also entitled to the $10,000 amount of loss figure is to argue that it is entitled to a downward departure because Ware received one. Apart from the fact that a sentencing court cannot depart from the appropriate guideline merely because of a disparity in sentencing, see United States v. Davis, 98 F.3d 141, 145 (4th Cir. 1996), there were obvious differences between the two defendants. We reject this contention.

Second, Tri-State argues that it was sentenced based on an incorrect fine range because, as the Government concedes, the amount of loss was actually less than the amount determined by the district court. Tri-State maintains that, if the district court's use of the contractual amount to be paid to Brothers by Tri-State is the appropriate measure of the amount of loss, then the correct figure is $169,487.60 (not $185,835.20) based on the supplemental agreement between Tri-State and WVDOH. The lower loss figure, in turn, would produce a lower fine range under section 8C2.7 of the sentencing guidelines; according to Tri-State, the new range would be $305,077.68 to $610,155.36 (not $334,503.36 to $669,006.72).

Thus, Tri-State wants to be resentenced in light of the amended contract amount between Tri-State and WVDOH, which was not brought to the sentencing court's attention until after Tri-State had been sentenced. Surprisingly, Tri-State suggests to us that this is newly-disclosed information that the Government failed to disclose to the sentencing court. Tri-State was in as good a position as anyone involved in this matter to correct the facts regarding a contractual arrangement between WVDOH and Tri-State itself. It is clear to us that Tri-State could have challenged, but did not, the specific loss figure that the district court settled upon at sentencing. Tri-State's "failure to object to a sentencing issue amounts to a waiver of [its] right to raise that issue on appeal, absent plain error." United States v. Ford, 88 F.3d 1350, 1355 (4th Cir. 1996); see Castner, 50 F.3d at 1277. Thus, to obtain the relief it seeks, Tri-State must establish that the district court committed plain error when it imposed Tri-State's $500,000 fine. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). We will exercise our discretion to cor-

27

rect plain error if Tri-State demonstrates the satisfaction of four conditions:

> (1) [A]n error, such as deviation from a legal rule; (2) the error must be plain, meaning obvious or, at a minimum, clear under current law; (3) the error must affect substantial rights -- in other words, the error must be so prejudicial as to affect the outcome of the proceedings in the district court; and, finally, (4) . . . the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Castner, 50 F.3d at 1277 (internal quotation marks omitted).

Tri-State contends that our decision in Ford established that the imposition of a sentence under an improper guideline range qualifies as plain error. See Ford, 88 F.3d at 1355-56. In Ford, the sentencing court erroneously included two criminal history points in the calculation of the defendant's sentence, resulting in a criminal history category III for the defendant. The sentencing court sentenced the defendant at the low end of the applicable range, but expressly noted that the sentence would have been at the bottom of the sentencing range even if the defendant's criminal history had only been a category II. Only after sentencing was it determined that the defendant's criminal history category was improperly determined, an error that the Government conceded. Conducting a plain error review, we observed that if the erroneous inclusion of the two criminal history points were not corrected, the defendant would serve a prison term three years longer than required under the sentencing guidelines. See id. at 1356. Under those circumstances, we concluded that such an error impacted the integrity of our judicial process:

> We cannot casually ignore th[e] fact [that the defendant would serve three years more than required] because of an overly-strict adherence to technical requirements. Three years of a man's life is not a trifling thing. No court of justice would require a man to serve three undeserved years in prison when it knows the sentence is improper. The fairness, integrity, and public reputation of our judicial system demand that we correct Reid's sentence.

28

Id.

Not so here. Assuming that the sentencing court committed an error that is plain, we conclude that this is not an error affecting Tri-State's substantial rights. The district court imposed a fine against Tri-State that was almost exactly in the middle of the fine range used by the district court. The fine would be only slightly above the middle of the fine range as calculated by Tri-State. There is nothing before us to indicate that the outcome would be different, even if we accepted Tri-State's position on this issue. In Ford, by contrast, it was crystal clear that, but for the error, the defendant's sentence would have been substantially different. Moreover, because the fine imposed by the district court fits into the middle of the fine range that Tri-State asserts is correct, we do not perceive this as the type of error that seriously calls the integrity of the judicial system into question. Accordingly, we are satisfied that Tri-State's sentence should be affirmed.

VIII.

Based on the foregoing, we affirm the convictions and sentences of Brothers and Tri-State.

AFFIRMED