**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4488**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

       v.

EMMITH MARREL SNELL,

              Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Chief District Judge. (3:14-cr-00073-FDW-5)

Argued: October 27, 2016           Decided: January 19, 2017

Before WILKINSON and TRAXLER, Circuit Judges, and Bruce H. HENDRICKS, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Chiege Ojugo Kalu Okwara, Charlotte, North Carolina, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Emmith Marrel Snell for possession with intent to distribute and distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). He was sentenced to 63 months in prison. On appeal, Snell claims that the government failed to produce evidence that he was entitled to receive under Brady v. Maryland, 373 U.S. 83 (1963); the Jencks Act, 18 U.S.C. § 3500; and Rule 16 of the Federal Rules of Criminal Procedure. Snell also challenges the sufficiency of the evidence to sustain his conviction. We affirm.

I.

From approximately January 2009 through April 8, 2014, Reginald Lindsey operated a drug distribution business in Charlotte, North Carolina. Lindsey purchased large quantities of powder cocaine, some of which he used to manufacture crack cocaine at a drug stash house. The Charlotte-Mecklenburg Police Department investigated Lindsey's drug operation. Between May and July of 2013, undercover officers conducted several controlled buys of crack cocaine from Lindsey and his associates.

One such controlled buy occurred on June 11, 2013, and involved Lindsey and two of his associates, Stanley Horton and Defendant Emmith Snell. Officer Amir Holding, acting in an undercover capacity, contacted Horton to arrange the purchase of

2

4.5 ounces of crack cocaine from Lindsey for $5,175. Horton, in turn, called Lindsey to get the drugs. Lindsey had already set up five drug deals with other customers for that day and he agreed to package the additional 4.5 ounces and meet Horton for the sale to Officer Holding. Lindsey packaged the drugs in clear plastic bags at the stash house.

In the early afternoon, Officer Holding and Sergeant Terrance Gerald drove to the location where the controlled buy was to take place. Sergeant Gerald got into the back seat of Officer Holding's vehicle and Horton, who had arrived separately, got into the front passenger seat next to Officer Holding. From the back seat, Sergeant Gerald videotaped the drug deal, although at times there was only an audio recording because he would have to lower the camera to avoid detection.

Officer Holding gave Horton the money for the crack cocaine. When Lindsey arrived, Horton got out of the undercover vehicle and into Lindsey's car, where Lindsey and Horton counted the money. Lindsey then realized that he had accidentally left the 4.5 ounces of crack cocaine on the kitchen counter of the stash house. Lindsey called Snell and asked Snell to go to the stash house, retrieve the drugs, and bring them to the location. Snell was a trusted friend to Lindsey and the only member of Lindsey's organization who had a key to the stash house.

Within minutes, Snell arrived at the controlled-buy location on a motorcycle. Snell got off the motorcycle and into the back seat of Lindsey's vehicle. He handed the crack cocaine, which was packaged in a clear plastic bag, across the front seat to Lindsey. Snell then returned to his motorcycle and left the location. Horton returned to Officer Holding's vehicle and delivered the crack cocaine, which a laboratory analysis confirmed to be cocaine base.

On April 8, 2014, a grand jury returned a thirteen-count indictment against eleven defendants, including Lindsey, Horton, and Snell. Snell was named in two of the thirteen counts. Specifically, Count 2 charged Lindsey, Horton, and Snell with conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846, from January 2009 through April 8, 2014. Count 9 charged Lindsey, Horton, and Snell with possession with intent to distribute and distribution of cocaine base on or about June 11, 2013, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and aiding and abetting that offense, in violation of 18 U.S.C. § 2. Snell pleaded not guilty to both counts.

Lindsey was charged in the indictment with two additional conspiracy counts, plus five additional counts of possession with intent to distribute and distribution of cocaine base, arising out of other drug deals that took place between May 8,

4

2013, and July 18, 2013. He subsequently agreed to plead guilty to the Count 2 conspiracy and cooperate with the government. This included meeting with the government on several occasions and providing testimony adverse to Snell at trial. In addition to his testimony regarding the June 11, 2013, sale of crack cocaine to Officer Holding, Lindsey offered testimony about his relationship with Snell and Snell's ongoing involvement in his drug business. The jury ultimately convicted Snell of Count 9, possession with intent to distribute and distribution of cocaine base on June 11, 2013, but acquitted him of Count 2, the conspiracy count.

## II.

Snell contends that the evidence was insufficient to convict him of the Count 9 possession with intent to distribute charge. We review a defendant's challenge to the sufficiency of the evidence de novo, and we must affirm if there is substantial evidence to support the conviction when viewed in the light most favorable to the Government. See United States v. Engle, 676 F.3d 405, 419 (4th Cir. 2012). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of guilt beyond a reasonable doubt." Id. "[R]eversal for insufficiency must be confined to cases where the prosecution's failure is clear." Id. (internal quotation marks omitted).

We conclude that there was sufficient evidence to support the jury's verdict. Lindsey testified that Snell was a member of his drug organization and the only person to whom he had entrusted a key to his drug stash house. When he realized that he had forgotten to bring the 4.5 ounces of crack cocaine for the sale to Officer Holding, Lindsey called Snell and asked him to go to the stash house and bring the drugs to him. Within minutes, Snell arrived at the location, entered Lindsey's vehicle, and handed a clear plastic bag containing 4.5 ounces of crack cocaine to Lindsey.

Lindsey's testimony alone is sufficient to support the jury's verdict. See United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997) ("[T]he uncorroborated testimony of one witness or of an accomplice may be sufficient to sustain a conviction."). But in this case, it does not stand alone. Lindsey's testimony was corroborated by the testimony of the undercover officers, who collectively observed Snell arriving at the scene and handing something over the console towards Lindsey, as well as by the video-recording of the transaction.

Snell's contention that Lindsey's testimony was not credible is of no avail. In resolving issues of substantial evidence, this court may not reweigh the evidence or reassess the factfinder's determination of witness credibility, and it must assume that the jury resolved all contradictions in

6

testimony in favor of the government.  See United States v. Roe, 606 F.3d 180, 186 (4th Cir. 2010).

We likewise find no merit in Snell's claim that the district court erred in allowing the officers to identify Snell in still photographs because the photographs were blurry, and Snell's related claim that, but for this identification, the jury's verdict would have been unsubstantiated or different. The officers were present on the scene when the video-recording took place and the district court did not abuse its discretion in allowing them to identify Snell and the other individuals based upon the still photographs and their memories. It was for the jury to view the photographs and decide what weight should be given to the testimony. Moreover, Snell does not deny that he was present at the location of the controlled buy; he merely contends that he could have been there for an innocent reason. That was for the jury to determine as well, and the photographs add nothing to that inquiry.

Accordingly, we hold that the district court did not err in admitting the officer's identification testimony and we conclude that the evidence presented to the jury was clearly sufficient to support the verdict.

## III.

Snell next contends that we should vacate his conviction because the government ran afoul of its discovery obligations

under Federal Rule of Criminal Procedure 16;[1] the Jencks Act, 18 U.S.C. § 3500;[2] and Brady v. Maryland, and its progeny.[3]

## A.

Snell first contends that we should vacate the jury's verdict because the government failed to disclose exculpatory statements that Lindsey allegedly made regarding Snell's involvement in his drug business and failed to produce a written statement allegedly obtained by the government from Lindsey. The district court found no Brady violation because Snell failed to demonstrate that the government was in possession of such statements. We affirm.

Lindsey met with law enforcement and the prosecution on October 21, 2014, and again on October 31, 2014. On November 3, 2014, the government produced to Snell a summary of these

---

[1] Rule 16(a)(1)(E) requires the government to permit the defendant to inspect documents and objects that are in the government's possession, custody, or control, and material to the defense, intended to be used in the government's case-in-chief, or obtained from the defendant.

[2] "The Jencks Act requires the [g]overnment to turn over any statement of a witness in its possession once the witness has testified on direct examination, provided the statement relates to the testimony of the witness." United States v. Bros. Constr. Co., 219 F.3d 300, 316 (4th Cir. 2000).

[3] See Brady v. Maryland, 373 U.S. 83, 87 (1963) (requiring the government to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment"); Giglio v. United States, 405 U.S. 150, 154-55 (1972) (requiring the government to disclose evidence tending to impeach a government witness prior to trial).

meetings that did not contain the purported exculpatory statements. The government also did not produce a written statement from Lindsey.

Unbeknownst to the government, Lindsey also spoke by telephone to Snell's girlfriend, Martha Scott, on October 21, 2014, to discuss the two charges that had been brought against Snell and to enlist Scott's help in getting Snell to plead guilty. Scott secretly recorded this conversation.

The day before trial, Snell's attorney, who had obtained a copy of the recording from Scott, produced it to the government. In the recording, Lindsey tells Scott that the government had them red-handed, and that Snell would probably receive a much lighter sentence if he pled guilty. Lindsey told Scott that he had minimized Snell's involvement in his drug business and that Snell had nothing to do with the other drug deals in the indictment. Lindsey also told Scott that he had written a statement to this effect for the government and that he believed the government would also give Snell a deal if he pled guilty.

Based solely upon this surreptitious recording, Snell filed a pre-trial motion to compel the government to produce any exculpatory or written statements made by Lindsey to or for the government. The government informed the court that Lindsey had consistently implicated Snell in his ongoing drug business and in the single controlled buy for which Snell was indicted, and

9

that Lindsey had made no such exculpatory or written statements to the government. Nor did the government have any prior knowledge of the telephone call between Lindsey and Scott.

The district court listened to the telephone recording in its entirety and reviewed in camera the government's interview notes from the meetings with Lindsey for the purpose of determining whether there was any undisclosed Brady material. It found none. However, the court ruled that Snell was free to use Lindsey's prior inconsistent statements to Scott as impeachment evidence, in accordance with the applicable rules of evidence, and to place the question of Lindsey's credibility regarding Snell's actual involvement before the jury.

That is precisely what occurred. Lindsey was questioned by the government and by defense counsel about the telephone call. The government played the entire recording of the telephone call for the jury's consideration. Lindsey testified, consistent with the government's representations to the court and the court's in camera review of the government's interview notes, that Snell had been involved in Lindsey's ongoing drug business and that Snell brought the 4.5 ounces of crack cocaine to him at his request for the June 11 deal. Lindsey also confirmed that he never provided a written statement to the government.

Lindsey also offered an explanation for his inconsistent statements to Scott during their telephone conversation. He

10

testified that the purpose of the telephone call was to convince Scott to persuade Snell to accept a guilty plea, as everyone else named in the indictment had done, so that Snell would also receive a lesser sentence. Lindsey testified that Snell was his best friend and closest confidant. He felt guilty because he had asked Snell to bring him the crack cocaine on June 11, and he believed that Snell would never have been on the indictment and would not be going to jail if he had not done so. Accordingly, Lindsey testified that he "was saying anything [to Scott] to try to [get] Emmith Snell to sign a plea." J.A. 225.

We find no error in the district court's factual findings or legal conclusions. Because Snell failed to establish that Lindsey made the alleged exculpatory or written statements to or for the government, he failed to establish that the government violated Brady or any of its other discovery obligations.

B.

Snell next contends that the government violated its discovery obligations by failing to inform him that Officer Holding had seen Snell at a drug deal involving Lindsey that occurred prior to the six drug deals at issue in the indictment. The government learned of this information the day before Officer Holding testified and made the decision not to use the evidence against Snell in the government's case-in-chief, even though the evidence was potentially inculpatory as to Snell.

11

The government did not inform Snell of this information prior to the conclusion of Officer Holding's direct examination.

At the start of Snell's cross-examination of Officer Holding, however, Snell's counsel asked an open-ended question that could have elicited this testimony from Officer Holding, prompting the government to interrupt for a side bar conference and inform the judge and defense counsel of this information. Snell objected to the late disclosure of the information as a violation of the government's discovery obligations, which the district court overruled, and the information was never presented to the jury.

We find no reversible error in the district court's ruling. The government was not required to disclose the information under Brady because it was not exculpatory. Nor did the statement relate directly to the controlled buys at issue in the indictment. Moreover, even if the government should have produced this information prior to the cross-examination of Officer Holding, there was no prejudice to Snell. Snell argues that he could have used Officer Holding's inculpatory testimony about Snell's presence at an unrelated drug deal to impeach Lindsey's favorable testimony that Snell was not involved in any of the other drug deals set forth in the indictment. Clearly, there is no reasonable probability that such testimony would have resulted in a different verdict on Count 9. But, in any

12

event, the information was disclosed to the defense in sufficient time for Snell reasonably and effectively to make use of it at trial. Snell chose not to do so.

C.

Finally, Snell alleges that the government violated its discovery obligations by failing to produce the conviction history of Snell's girlfriend, Martha Scott. Scott was called by the defense to testify about Snell's sources of legitimate income and to provide support for his theory that he did not need to participate in Lindsey's drug business. Scott was not present at the June 11 controlled buy, nor did she offer any information about that transaction. During cross-examination, the government impeached Scott with her prior conviction for providing fictitious information to an officer. Snell did not object.

After trial, Snell filed a motion to compel, and argued that the government had failed to comply with his earlier "Motion for Pre-Trial Production of Brady and Impeachment Evidence Concerning Government Witnesses," J.A. 53, which had requested, among other things, the "FBI rap sheet, NCIC printout and any other records available to the government reflecting the arrest and conviction history of any [such] witness." J.A. 55. Construing the post-trial motion to compel as a motion for a new

13

trial or for a judgment of acquittal, the district court denied the same.  We affirm.

Scott was not a government witness.  The government had no obligation under Brady or otherwise to anticipate who the defense might call as a witness and disclose evidence that was only relevant to the government's potential impeachment of a defense witness.  The evidence was easily and equally obtainable by the defense.  Moreover, given Scott's lack of knowledge or testimony about the June 11 drug deal, there is no reasonable probability that, had the information been disclosed to Snell, the result of the verdict on Count 9 would have been different.

IV.

For the foregoing reasons, we affirm the district court's judgments.

AFFIRMED

14